## Case No. 7,922.

### KOHNE v. INSURANCE CO. OF NORTH AMERICA.

#### [1 Wash. C. C. 158.] [1]

Circuit Court, D. Pennsylvania. Oct. Term, 1804.

MARINE INSURANCE — CONCEALMENT OF FACTS — PECULIAR CIRCUMSTANCES KNOWN ONLY TO INSURED—WELL-KNOWN FACTS AND CONDITIONS—RESHIPMENT—GOODS LANDED.

1. The underwriter, by consenting to take upon himself a risk, which the assured is not willing to bear, does it always under an implied condition; that he shall, as to all facts within the private knowledge of the assured, be equally informed as himself; have the same opportunity of measuring the extent of the danger; and be enabled to judge of the compensation, at which he would think it prudent to enter into the contract.

[Cited in Clark v. Manufacturers' Ins. Co., Case No. 2,829, 8 How. (49 U. S.) 248; Hamblet v. City Ins. Co., 36 Fed. 122.]

2. The underwriter is always supposed to be acquainted with public transactions, foreign laws or ordinances, the course of nature and of trade.

3. All circumstances in themselves peculiar, and which may be material, and which are in the knowledge of the assured only; should be stated to the assurer.

4. The laws of the United States. relative to the importation of merchandise, require that the goods imported shall be landed. It is not a compliance with those laws, to bond, or pay the duties on importation, and permit the goods to be re-exported. without being landed.

[Cited in Kidd v. Flagler, 54 Fed. 369.]

[This was an action of trover by Kohne against the Insurance Company of North America for a policy of insurance. There was a verdict for the plaintiff. Case No. 7,920. A motion for a new trial was made by defendant, and granted. Case No. 7,921. It is now heard upon the new trial.]

This cause came on to be re-tried at this term. The evidence given at the last term, was again produced, and in addition thereto, a complete record of the proceedings in the vice admiralty court at Halifax, was pro-

duced, and read. In it is stated at length, the following papers. A passport from the Spanish consul, at Charleston, to the plaintiff, 17th February, 1799, to go to Laguira, to attend to his concerns there. A clearance for the Gadsden and cargo at Laguira; stating that a cargo of cocoa and tobacco had, by special permission of the intendant, been shipped on board the Gadsden, for Charleston, with leave to touch at Porto Cabello; and that the said goods were free of duty, by order of the intendant. Another clearance at Porto Cabello, for the United States, the duties being paid. A passport of the Spanish consul at Charleston, dated 18th June, 1799; for the plaintiff to go to Spain; and a certificate that the cargo was from Laguira, and Porto Cabello, as appears by the above mentioned Spanish papers, which he certifies.

The following new testimony was given: Mr. Buntin was in Laguira, when plaintiff arrived there. He sold part of his cargo to the intendant there; and was to receive in return, cocoa, tobacco, and some specie, and to be free of duties upon his inward, as well as outward cargo; from thence he went to Porto Cabello, where he sold the rest of his cargo, and took in cocoa, hides, &c. and left a quantity, which he could not bring away, in the king's warehouses. It was proved by two or three witnesses, that it was practised in Charleston, and had been done in a few instances at Philadelphia; for vessels coming from the Spanish colonies, by special permission of the collector, to enter there, secure the duties, and clear out for Spain; without landing the cargo. That policies on such cargo had been underwritten at Charleston, and by private underwriters in Philadelphia; and upon a disclosure of those facts, they had been done at ten per cent.; and that the circumstance of not landing made no difference in the premium; until it was known that the British courts condemned such vessels and cargoes. That it was some time after the insurance in question, that the difference was made. Amongst the papers, found on board the Gadsden when she was captured, was a letter from plaintiff to his clerk in Charleston, saying; that he did not wish to run any risk except as to the ship, but that the cargo must be insured, cost what it would. In Kohne's answer to the libel, he states, that special permission to enter and clear, without landing, was granted to some, as matter of favour, but not to every one.

The only point argued at this trial, was the materiality of the circumstances which attended this cargo, particularly the not landing at Charleston, and whether the plaintiff ought to have disclosed them. To prove that it was an importation, though not landed, the plaintiff's counsel cited, Bunb. 79; 12 Coke, 17.

In addition to the arguments urged by the defendants, at the last trial, they contended; that by the revenue laws of congress, the goods ought to have been landed

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

at Charleston; and they relied upon certain passages in 4 Laws [Folwell's Ed.] pp. 380, 397, 399, 400, 411.

WASHINGTON, Circuit Justice (charging jury). I am much pleased that a new trial was granted in this cause. I was not satisfied with the verdict, yet I felt some little hesitation about setting it aside; not knowing whether the jury went upon the immateriality of the circumstance of not landing the cargo, to the risk; or upon some legal point on which the court had charged them. But I was principally influenced by the importance of the question, and an expectation that the evidence would be more complete: and the counsel would be better prepared to devote their attention to the only question in the cause. In both respects, I have been gratified; instead of extracts of the proceedings at Halifax, we have now the entire record,[2] and new testimony has been introduced, as to the custom of not landing, and the materiality of that circumstance to the risk. The question, what is a legal importation, according to the laws of congress, was only hinted at then; and has now been thoroughly argued. This is the case of an insurance on a cargo on board the Gadsden, at and from Newport, to Passage in Spain, effected on the 12th of October, 1799. But as the previous history of the ship and cargo, forms the whole ground of difficulty in the case, it becomes necessary for the jury perfectly to understand it. It appears, that the plaintiff left Charleston in February, 1799, in this ship, with a cargo of flour for Laguira; taking with him a passport from the Spanish consul at Charleston, to go to Laguira, to attend to his concerns; that he arrived at Laguira on the 23d, entered into a contract with the intendant for the sale of a part of his cargo; by which it was agreed that he should receive in return cocoa, tobacco, and some specie, and that both his inward and outward cargo should be free from duties. He received from the officer at Laguira, a clearance for Porto Cabello, where he arrived, disposed of the residue of his cargo, for cocoa, hides, &c. took in a full load, and obtained his clearance for the United States; having paid duties on the goods taken in at this last port. On the 23d June, he arrived at Charleston, landed some of his cargo, and took in articles the produce of Carolina; and obtained a special permission from the collector, to enter and secure the duties, without landing the residue of his cargo. Here he obtained another passport from the Spanish consul, for Passage in Spain; with a certificate that the cargo, (except the part taken in at Charleston,) was from Laguira and Porto Cabello; and authenticating the Spanish papers, to serve as occasion might require. With these papers, and the passports to La-

guira, he cleared out for Spain; was obliged, on account of a leak, to put in at Newport, where he landed his cargo, repaired the ship, proceeded on his voyage, and on the 10th September was captured by a British privateer, carried into Halifax, and his vessel and such of the cargo from Laguira and Porto Cabello, as had not been landed at Charleston, was condemned.

The question is, ought the not landing of the cargo at Charleston, and the circumstances attending the cargo, or indeed any other of the circumstances before related, to have been disclosed to the underwriters, at the time they were applied to, to insure this property? And this depends upon another question, which is; were those circumstances, or any of them, material to the risk? and if it should be determined, that the not landing such a cargo as this, under the above circumstances, was material to the risk; then the law declares, that they ought to have been communicated to the defendants, and that the omission to do so, whether by fraud or accident, vacates the policy. The underwriter, by consenting to take upon himself that risk, which the assured is not willing to bear, does it always under an implied condition, that he shall, as to all facts, within the private knowledge of the assured, be equally informed as himself; have the same opportunity of measuring the extent of the danger, and be enabled to judge of the compensation, at which he would think it prudent to enter into the indemnity. As to public transactions, foreign laws or ordinances, the course and nature of the trade, &c. by which the risk may be affected, the underwriter is always supposed to be equally well informed as the assured, provided they are notorious and generally known. The argument, that the underwriter is bound to inquire into facts, which he may suppose material to the risk, can never be maintained. It would subvert the whole law of insurance. Without previous information of the circumstances which had attended the vessel, he would not know what inquiries were pertinent; and though he should exhaust himself with interrogatories, he might at last omit the only question which was important. The assured, in his answers, might answer truly; and yet, by omitting to tell the whole truth, might conceal all that was useful for the assured to know. No hint was suggested to the defendants, of the nature of the cargo, or the information proper for them to obtain; for, although they knew that cocoa in bulk was probably the produce of a Spanish colony, yet they could never suspect, from that circumstance, that it had been brought in and imported again, without landing.

It is contended for defendants; that the not landing the cargo at Charleston, subjected it to confiscation in a British court of admiralty, for a breach of the order issued by the British cabinet in 1798, authorizing her armed vessels to bring in for adjudica-

---

[2] Read without objection, and the evidence it afforded, argued from on both sides.

tion, all neutral vessels, trading directly between any colony of France, Spain, or the United Provinces, and any port in Europe, except that of England, or the country to which the vessel belongs. On the other side it is insisted; that no proof was given to the jury, that the plaintiff knew of the order. It is not necessary for the defendants to bring home to the plaintiff a knowledge of this fact; because if it were notorious, and generally known in the United States, the jury may fairly presume it was known to the plaintiff. But how does this matter stand? It is well known, or ought to be known, by all men engaged in commercial matters, and particularly in the business of insurance; that Great Britain has, for a long time, asserted the right to confiscate the property of neutrals, if taken engaged in carrying on in time of war a trade with the colonies of her enemy, which was interdicted in time of peace. This principle was declared, and announced to neutral powers, by the orders of 1793. In consequence of the remonstrances of the American government against the severity of the rule, it was so far relaxed by the orders of 1794, as to permit a trade between those colonies and the American neutrals; and the orders of 1798 extended the same relaxation to European neutrals; so that the rule itself is ancient, and the relaxation was as old as 1794; of which it would be going too far to say the plaintiff was ignorant.

The decision, whether the cargo of the Gadsden came fairly within the scope of these orders, must depend upon the fair construction of them, uninfluenced by the opinion of the court at Halifax, in this case; or of any of the decisions which have been read from Robinson's Reports, of which the plaintiff could not be informed. It is plain, that if the original voyage had been from Laguira to Spain; the calling at Charleston, and reporting the cargo, or even the paying of duties; nay, the landing of the cargo, would not have taken her out of the operation of the orders of 1794. If the trade, directly, was deemed illegal; the attempt to cover the voyage, under an appearance which was not real, would not change its nature. The British courts would not, and ought not, to be duped by such an artifice. That which in its real character is illegal, cannot be rendered legal by any device whatever, though it may often prevent the discovery of the truth. But when the covering, thus put on by fraud, is removed, the transaction is not rendered less illegal, by the attempt to conceal its real character. So on the other hand, if the voyage had really been to Charleston, the cargo landed, entered, and duties secured; a determination, formed on second thought, to send the cargo to Spain, would not render it a direct trading from Laguira to Spain, though the goods never were warehoused or removed from the wharf. The circumstance of warehousing,

would be no more evidence of a bona fide importation—a kind of testimony of the sincerity of the transaction.

It has been insisted by the defendants' counsel, that the evidence is strong enough to prove, that the original voyage was from Laguira and Porto Cabello to Spain, and that the calling at Charleston was merely colourable. To prove this, the defendants rely on the following circumstances: the nature of the cargo, cocoa and indigo, which could not have been intended for consumption in the United States. The answer to this is, that the plaintiff had an ulterior view, as no doubt he had, to the Spanish market for these articles; if the voyage from Laguira was really to Charleston, and the importation there complete; it could not be termed a direct trade between Laguira and Spain; and this conclusion, I think perfectly just. The other circumstances relied upon are, the reasons assigned for the special permission not to land, to save time and expense, and granted only in cases where the goods are intended for exportation. The passport of the Spanish consul to Laguira, which, though it had answered its intended purpose as soon as it was shown to the intendant there, was still carefully preserved, and was found amongst the papers at the time of the capture. The sale to a Spanish officer, under a contract, in no manner accounted for; and of an exemption from duties on the inward and outward cargo. The clearance at Laguira and Porto Cabello. The passport, of the Spanish consul at Charleston, to Spain, and his certificate that the cargo (not landed at Charleston) was from Laguira and Porto Cabello, with his authentication of the Spanish papers; which it is said could be in no wise useful but to entitle the plaintiff to particular privileges, in consideration of the risk he has run in carrying on an unlawful trade. The answer given to these circumstances is, that the cocoa from the Carraccas, commanding in Spain a much higher price than that produced elsewhere, (as proved by one of the witnesses;) it was important, on account of obtaining this high price, to prove it the product of that settlement; a motive very consistent with a bona fide importation into the United States. Another circumstance. relied upon by the defendants is, the plaintiff's letter to his clerk, in which he shows his confidence in the safety of his ship. and his apprehensions as to the cargo; which could only arise from a consciousness of having. as to the cargo, exposed himself to the risk of capture by British cruisers.

The last circumstance most relied on. not only as evidence of the voyage being direct from Laguira to Spain, but as being most material in increasing the risk, is the not landing the cargo at Charleston. And if the laws of congress did require that to be done, the omission would most certainly be deemed an important circumstance in a Brit-

ish court of admiralty, to prove the illegality of the voyage. It would be perfectly fair to say, "Notwithstanding your clearance at Porto Cabello is for the United States, your failing to perform those things required, in cases of importation, by the laws of your own country, falsifies your professions. How can you call that an importation into the United States, which does not correspond with the provisions of your own laws?"

How then does this question stand? The law does not in express terms say they shall be landed, but yet it cannot be construed to mean any thing else. The literal meaning of importation is, to bring in, with intent to land; but where the goods are intended for exportation, the law of congress requires something further to be done. The law declares, that duties on goods imported, are to be paid or secured before a permit is given to land. To entitle the importer to drawbacks on the exportation of the same article, he is, previous to putting or lading the same on board, to give notice to the collector of his intention to export. Then they are to be inspected by a particular officer, and if found to correspond with the notice and proof, a permit for lading is to be granted. But the lading is to be under the superintendence of the person who inspected them. Now, without landing, these things cannot be done. Bringing in a cargo without landing, is no more an importation in reference to the above act of congress, than is by the same act, a mere reporting, without paying duties or claiming drawbacks. For a cargo brought in and reported, is as much within the territorial jurisdiction of the United States, and is as much a part of the national stock, if the property of a citizen, as if the duties had been secured and drawn back; but it is not an importation within the revenue laws of the United States, if they are carried away without landing. In the one case, no duty is paid; in the other, it is secured and drawn back.

If the above principles be correct, the custom set up as existing at Charleston and Philadelphia. in some cases, is void, and cannot control the law. But, even if this point were doubtful; if the circumstance of not landing were material to the risk; the facts should have been stated to the underwriters, that they might have an opportunity, as well as the plaintiff, of judging as to the effect of that circumstance. If, as has been argued, it would be a hardship to require of the plaintiff to communicate what he did not deem material; it is not less hard that the defendants should suffer, because it was not communicated. If one of two men, equally innocent in intention, must suffer, the loss should fall on him whose conduct contributed to the loss, or contributed to mislead the other.

Upon the subject of the materiality of the concealment, some additional evidence has been given, which is proper for your consideration. It is proved, that the defendants always rejected such risks, or demanded such high premiums, as to turn away applicants. On the other hand, it is proved, that in Charleston, and by private underwriters in Philadelphia, those circumstances made no difference in the premium. The defendants, no doubt, construed the English orders, and the acts of congress, as the court does—the other underwriters differently.

With these observations, I shall leave the case with the jury.

The jury found a special verdict, in which they ask the opinion of the court, whether a landing at Charleston was necessary. Judgment on the verdict for defendants.