cannot be admitted against the separate estate, in competition with the separate creditors.

MARX (CLARK v.). See Case No. 2.830.

## Case No. 9,182.

### The MARY.

[Blatchf. Pr. Cas. 618.] [1]

District Court, S. D. New York. Jan. 17, 1865.

PRIZE—BLOCKADE—COMING OUT OF BLOCKADED PORT—NO PAPERS—ADMISSIONS OF MASTER.

Vessel and cargo condemned for an attempt to violate the blockade.

In admiralty.

## Case No. 9,183.

### The MARY.

[1 Gall. 206.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1812.

EMBARGO—INTENT—VOLUNTARY ARRIVAL—PRIMA FACIE CASE.

To constitute an importation of a cargo into the United States, there must be a voluntary arrival within some port with intent to unlade the cargo. An involuntary arrival, by stress of weather, does not constitute an importation. A coming into port with a cargo is prima facie evidence of importation.

[Cited in The Boston, Case No. 1.670; U. S. v. Lyman. Id. 15,647; The Gertrude. Id. 5,-370; Waring v. Mayor of Mobile. 8 Wall. (75 U. S.) 116, 120; Kidd v. Flagler, 54 Fed 369; The Coquitlam, 57 Fed. 717.]

See U. S. v. Arnold [Case No. 14.469]; s. c., affirmed, 9 Cranch [13 U. S.] 104; U. S. v. Lindsey [Case No. 5,603]; The Mary, 1 Dod. 68.

[Appeal from the district court of the United States for the district of Massachusetts.]

There were two informations in this case; one against the schooner for taking on board, at Liverpool in Great Britain, certain goods

---

of British manufacture, with intention to import the same into the United States, with the knowledge of the master, against the act 1 March 1809, c. 91, § 6 [2 Story's Laws, 1116; 2 Stat. 529, c. 24]; another against the cargo of the schooner, being goods of British manufacture, for being imported into the United States, contrary to the same act (section 5). By consent, both informations were heard together upon the facts stated by the district judge in his decree, and the papers transmitted on the appeal. In that decree, the facts are stated as follows: "These goods were shipped on board the Mary at Liverpool, in November last, by Carter and Storr, citizens of the United States, established and doing business as merchants at that place. The destination of the vessel was for Amelia Island, or any port to which she might be ordered to proceed by said Stephen Higginson, Jr. The bills of lading, in possession of said Higginson, bear date Nov. 13, A. D. 1811. The vessel touched at Lisbon, where the master was for some misconduct, or unsatisfactory behavior, displaced, and John Baxter received the command by appointment of the American consul. On the 28th Feb. said Baxter received his instructions from the consul, and was directed to proceed with said vessel to Boston Bay, and there to await the coming of a pilot boat, which would convey the instructions of said Higginson, and which were to be pursued. He was not to proceed into port with said vessel, unless so ordered by said Higginson, or unless he should learn, that goods purchased prior to the non-importation law would be admitted to entry. Soon after receiving these instructions, said vessel sailed from Lisbon, and on the 10th of April, having arrived in Boston Bay, was boarded about four miles from the Boston Light House, by a pilot boat, bearing a letter from said Higginson to Baxter, the master, directing him to proceed to Halifax. It appears to have been the determination of the master to comply with these instructions. But a strong head wind prevented an immediate departure from the bay, and in an hour after the receipt of the letter, the weather was such, that the master found it necessary, for the safety of the vessel and cargo, and of the crew, to seek a place of safety, and came to anchor in Nantasket Roads. About 4 o'clock p. m. on the same day, possession was taken of the vessel by a revenue cutter, and the next day she was brought under detention into the inner harbor. A manifest of the cargo was forthwith presented to the custom-house, with a destination expressed and claimed for Halifax, but intelligence of the recent embargo act having that day reached Boston, the collector considered himself restrained from permitting the departure of said vessel. A seizure was afterwards made, and this libel was filed, alleging said cargo to be liable to forfeiture under the 5th sect. of the act of March 1, 1809."

G. Blake, for United States.
C. Jackson, for claimants.

STORY, Circuit Justice. From an examination of the facts, (the result of which does not seem contested) I am satisfied that an actual landing of the goods was not intended to be made in any port of the United States, contrary to the statute; and that the goods of course were not put on board with that intent. It would seem, therefore, that no forfeiture could attach to the vessel, or cargo. But it is contended on the part of the United States, that as the vessel arrived voluntarily within four miles of the coast, the importation became complete into the United States, as to its effects both on vessel and cargo. That as to the former, such arrival rebuts all presumption of a contrary intention, because the whole papers and evidence show, that the goods were laden with an intention to come as near the coast, as within four miles; and that as to the latter, the subsequent necessity imposed on the party, of coming into port, will not suspend the forfeiture fixed by the prior importation.

In support of this argument, the attorney for the United States has cited the 4th section of the act, 1 March 1809, c. 91 [c. 24], which declares, that it shall not "be lawful to import into the United States, or the territories thereof," &c. any goods of British growth, produce or manufacture, &c.; and also the 27th sect. of the collection act of 2 March, 1799 [1 Stat. 648], which prohibits any goods from being unladen from any vessel, "bound to the United States," within four leagues of the coasts thereof. The attorney further argues, that as to revenue cases, the term "import" means merely "bringing into," and that the limits of the United States extend to a greater distance than a marine league from the shore; and as to enclosed bays, like Boston Bay, at least in a direct line across from the head lands.

I will not undertake to decide how far, in a national view, the limits of the United States extend on the sea coast. Perhaps the argument of the attorney on this head may be perfectly consistent with the law of nations, but as to revenue laws, I am well satisfied that an importation into the United States, means not merely a bringing within our jurisdictional limits, but also a bringing into some port, harbor, or haven, with an intent to land the goods there. It is undoubtedly true, that the mere act of coming into a port, though without breaking bulk, is prima facie evidence of importation. Yet even this presumption may be rebutted. If a vessel come in by distress, or to avoid capture, it has never been considered as an importation, as to foreign ships; nor could a different rule be applied as to citizens. The Eleanor, 1 Edw. Adm. 135; The Paisley, Id. Append. 17; Reeves, Shipp. (2d Ed.) 197; Bunb. 236. Indeed it has been doubted, whether an arrival within the limits of the port of

London, though it should seem nearly twenty miles below the usual places of unloading, constituted an importation. Leaper v. Smith, Bunb. 79. Upon a careful examination of the case of U. S. v. Vowel, 5 Cranch [9 U. S.] 368, the court evidently consider, that an importation into the United States did not mean an arrival within the limits of the United States, or even of a collection district, but within some port, harbor, &c. with an intention there to unload the goods. The case there was, that a cargo of salt had arrived within the collection district, but not within the port of Alexandria until after the repeal of the act, levying a duty on salt. The words of the first act were, that a duty should be levied upon all salt, &c. "brought into the United States," from any foreign port or place, &c. (Act Aug. 10, 1799, c. 39, § 1), and of the supplementary act, upon all salt "imported into the United States" (Act July 8, 1797, c. 15, § 1). The court held that the duty was not payable, because it did not accrue until the vessel arrived at the port of Alexandria. They consequently held, that until such arrival the importation was not completed.

The statutes of the United States on the subject of the revenue, evidently adopt the same construction. The 32d sect. of the collection act of 2 March, 1799, c. 128 [1 Story's Laws, 601 (1 Stat. 651, c. 22)], contemplates the case of a vessel arriving at a port of the United States, with a destination of her cargo to a foreign port, and provides that, in such case, the cargo shall not be liable to the payment of duties. The 2d section of the act, 22d Feb. 1805, c. 78 [2 Story's Laws, 962 (2 Stat. 316, c. 18)], has a similar provision. I consider, therefore, the mere arrival within the jurisdictional limits of the United States, even supposing that they extend beyond a marine league, and to the four miles stated in the evidence, as not constituting an importation within the purview of the law. If this be true, there can be no doubt that the subsequent arrival within the port of Boston, in consequence of stress of weather, cannot be considered as an importation. The cases of distress and wreck are exempted from the operation of these, and I believe most other revenue laws. See Sheppard v. Gosnold, Vaughan, 159, 166; Courtney v. Bower, 1 Ld. Raym. 501; Hale, "Customs;" Harg. Law Tracts, 123; Peisch v. Ware, 4 Cranch [8 U. S.] 347, 355, note; Reeves, Shipp. (2d Ed.) 196, etc.; Reniger v. Fogossa, 1 Plowd. 1; Hardr. 358, 361; 2 Ruth. Inst. 353.

On the whole, I am satisfied that neither vessel nor cargo is forfeited. There was no loading with an illegal intent to import into the United States, which would affect the former with forfeiture, and no voluntary illegal importation, which would contaminate the latter.

I affirm the decree of the district court as to vessel and cargo, but I shall certify reasonable cause of seizure. Restored.