*C. Brown*, for defendants.

———

REPUBLIC OF HAWAII *v.* W. B. ANDERSON, M. CONNELL, H. W. WHEELER, J. H. BROWN, C. E. GALE and HO WAI.

APPEAL FROM DISTRICT COURT OF HONOLULU.

SUBMITTED MARCH 19, 1896.          DECIDED APRIL 11, 1896.

JUDD, C.J., FREAR, J., AND W. A. KINNEY, ESQ., OF THE BAR, IN PLACE OF WHITING, J., DISQUALIFIED. (W. A. KINNEY DISSENTS AS TO CERTAIN SEAMEN.)

A voluntary bringing of opium from a foreign jurisdiction to a landing place, though not a port of entry, within this jurisdiction, with intent to unlade the same there, is an "importation" within the meaning of Sec. 1, Act 12, Prov. Gov't Laws.

The evidence in this case held sufficient to support a judgment against the crew as well as against the master on a charge of unlawfully importing opium, the evidence casting strong suspicion upon the crew, and no attempt having been made to furnish a satisfactory explanation of it.

OPINION OF THE COURT BY FREAR, J.

The defendants appeal on points of law from a judgment of the District Magistrate of Honolulu finding them guilty of

importing opium contrary to the provisions of Section 1, Act 12, Prov. Gov't Laws.   They are the master and crew of the schooner Henrietta from Victoria, British Columbia, seized at Keau on this island, not a port of entry, December 21, 1895, with 1398 pounds of opium on board.

Appellants contend in the first place that no importation was shown because the opium was not brought into a port of entry.   It is true, expressions may be found in some cases to the effect that an importation is not complete until arrival at a port of entry.   But in such expressions the emphasis was on the words "arrival at the port," not on the words "of entry," the phrase "port of entry" being used casually as a synonym for "point of destination" and when as a matter of fact the port under consideration was a port of entry.   "Port of entry" in such cases is used interchangeably with "port," "haven," "harbor," and other words, the distinction being taken not between arrival at port and arrival at port of entry, but between arrival at port, that is, at destination, and arrival within jurisdictional limits,—generally for the purpose of determining at what time duties become payable within the meaning of the revenue statutes.   On the contrary, the language of the decisions throughout is to the effect that, in law and general usage, as well as etymologically, an "importation," in the broad meaning of the term, consists of a voluntary bringing in of goods with intent to unlade the same.   See *Schooner Mary*, 1 Gall. 206; *Schooner Boston*, Ib. 239; *U. S. v. Arnold*, Ib. 348; *U. S. v. Lyman*, 1 Mason 499; *Kohne v. Ins. Co.*, 1 Wash. C. C. 165; *U. S. v. Steamboat Forrester*, 1 Newb. 94.   In this case the evidence is ample to show that the opium was brought from Victoria to Keau voluntarily and with intent to land it there.   Our own statutes also show that the meaning of the term "importation" was not intended to be confined to the introduction of goods into ports of entry.   True, lawful importation is so limited, but unlawful importation may take place either at ports of entry or ports not of entry.   Section 526 of the Civil Code expressly refers to "goods *imported*"

"*at any other port* in the Hawaiian Islands, *than a port of entry*" and imposes a penalty for such importation. And in the statute under which these defendants are charged, which is not a revenue statute but "strictly prohibits" "the importation of opium or any preparation thereof into the Hawaiian Islands," except by the Board of Health for medical purposes, the word "importation" was used evidently in the sense of "bringing in" and with an intention on the part of the legislature to prohibit any introduction of opium, except as aforesaid, into these islands, at any port or place whatever, whether of entry or not.

It is contended in the second place that, even if an importation were shown, the evidence is not sufficient to implicate the several defendants.

As against Anderson (the master) and Gale the evidence is so overwhelming as to need no comment.

As against the others the case is not so clear, but on the whole and bearing in mind that the question before this court is not one of fact, whether the evidence showed guilt beyond a reasonable doubt, as it was before the District Magistrate and would have been on a general appeal to the Circuit Court, but one of law, whether there was sufficient evidence to support the judgment, we are of the opinion that there was such evidence.

Assuming that the men did not know the purpose of the expedition before they left Victoria, but that they shipped on a voyage of several thousand miles in a vessel of only 31 tons register and with no apparent object except to carry a few small cases of cargo, without first inquiring into the nature of the enterprise, or, if they did so inquire, that the master deceived them, and that he ventured on this long voyage and hazardous undertaking without first assuring himself that the men could be relied upon to assist him in the execution of his illegal purpose, still there can be little doubt that the men became aware of the object in view before they reached Keau, for the vessel was a small one (only about fifty feet long), the opium was the only cargo, it was in plain view in the hold

which opened directly into the cabin and during the voyage it was taken from the 22 cases in which it was shipped and repacked in 58 cases, the master and crew apparently intimately associated together and that too in the cabin as well as elsewhere, the voyage was direct to these islands and to Keau, an out of the way place. These facts are sufficient to support an inference that before reaching Keau the men knew of what the cargo consisted and that it was intended to be unlawfully landed there.

With presumably this knowledge, they assisted in bringing the schooner to its anchorage at Keau and there waited quietly on board a day and a night for Gale who had been put ashore apparently to arrange for landing the opium. Gale having been arrested and told that a boat would soon arrive from Honolulu to capture the schooner wrote to the master to get away and return in about fourteen days, evidently having no thought but that the men were of a mind willing to serve further in the prosecution of the enterprise, and when they were found on board by the officers they were together with the captain in the stern appearing satisfied with their situation and had nothing to say by way of explanation. At the trial also no attempt at an explanation was made nor did it appear that it was not easily in the power of the defendants to furnish an explanation. While no inference prejudicial to one accused can be drawn from his neglect or refusal to give evidence on his own behalf, yet where the evidence for the prosecution is such as to throw great suspicion upon him, his failure to produce or to endeavor to procure for production evidence which would explain his position or the facts casting suspicion upon him, when, so far as appears, it is within his power to do so, may properly be considered in passing upon the question of his guilt. See *Prov. Gov't. v. Gertz*, 9 Haw. 293.

Judgment affirmed.

*W. O. Smith, Attorney-General,* for prosecution.
*Hartwell, Thurston & Stanley,* for defendants.

OPINION OF W. A. KINNEY.

While concurring with the majority of the Court in the construction to be put upon the Act under which the defendants are charged and also in finding the evidence sufficient to convict the master and Gale, I doubt the sufficiency of the evidence against the three seamen and the cook, and therefore respectfully dissent from affirming judgment as against them.