TENBROEK (UNITED STATES v.). See Case No. 16,446.

TEN CASES OF MERCHANDISE (UNITED STATES v.). See Case No. 16,447.

---

## Case No. 13,828.

### TEN CASES OF OPIUM.

[1 Deady, 62.] [1]

District Court, D. Oregon. March 11, 1864.

FORFEITURE—LANDING GOODS WITHOUT PERMIT—REIMPORTATION.

1. Goods of whatever growth or manufacture brought from a foreign port or place, and land-

---

[1] [Reported by Hon. Matthew P. Deady, District Judge, and here reprinted by permission.]

---

ed at a port or place within the United States without a permit, are forfeited to the United States under section 50 of the collection act (1 Stat. 665).

[Followed in The Coquitlam, 57 Fed. 706.]

2. Foreign goods once lawfully admitted into the United States, if re-exported or voluntarily placed within the limits of a foreign jurisdiction, lose the character imparted to them by such admission, and if re-imported into the United States, it must be done in conformity with the law governing the importation goods of a foreign growth or manufacture from a foreign country.

3. If opium was shipped from San Francisco via the foreign port of Victoria to Portland, and while the ship was lying at Victoria the shipper of the opium should cause it to be taken ashore and placed in a house in Victoria, for even .a few hours, or less time, and then cause it to be re-laden upon the ship and brought thence to Portland, such opium would be brought from a foreign port and liable to become forfeited by being landed without a permit.

At law.

Edward W. McGraw, for plaintiff.
W. Lair Hill, for claimant. .

DEADY, District Judge. ' The information in this case was filed November 4, 1863. In the first count it is alleged that the opium was brought in the steamship Sierra Nevada, from the foreign port of Victoria to the port of Portland, and here unladen without a permit, and was seized as forfeited for this cause by the collector on October 22, 1863. In the second count it is alleged that the opium was brought from and to the ports aforesaid, but not entered upon the vessel's manifest, and therefore became and was forfeited to the United States. The claimant, Wha Kee, a Chinese merchant of Portland, on November 7, 1863, demurred to the second count because the facts stated were not sufficient to cause a forfeiture, which demurrer was confessed by the district attorney. On December 9, 1863, the claimant answered the first count of the information, denying that the opium became forfeited by reason of being unladen without a permit as alleged, or that the same was brought from any foreign port, and alleging that said ten cases of opium was purchased by the claimant in San Francisco, about October 16, 1863, of one Pon Jib, who shipped the same to claimant at Portland, via Victoria, on the Sierra Nevada. By the stipulation of the parties the cause was tried without the intervention of a jury, on March 7, 1864, and was continued for decision until March 11. This seizure is made under section 50 of the collection act of 1799, which declares: "That no goods, wares, or merchandise, brought in any ship or vessel from any foreign port or place, shall be unladen or delivered from such ship or vessel within the United States * * * without a permit from the collector * * * for such unloading or delivery, * * * and all goods, wares, or merchandise. so unladen or delivered shall become forfeited, and may be seized by any of the officers of the cus-

toms." 1 Stat. 665. The answer must be taken to admit that the opium was landed without a permit. The allegation that it did not "become forfeited to the United States by reason of being unladen without a permit," is a conclusion of law, and not a denial of the averment that it was so unladen.

The only issue then arising upon the pleadings, is, whether the opium was brought from a foreign port or not.

From the admissions in the pleadings and the evidence the following facts are satisfactorily proven: That between October 17 and 22, 1863, while the Sierra Nevada was lying at the harbor of Esquimalt, at Vancouver's Island, on a voyage from San Francisco to Portland, a Chinaman called Ching Sung, a partner of the claimant, brought two common-sized trunks in a spring wagon from Victoria, containing ten cases of opium, and caused them to be delivered on board the vessel; and that Dyer, the freight clerk, on account of certain suspicions which he then entertained and which will be hereafter noticed, did not allow Ching Sung to take these trunks to his state-room, as he desired, but directed the porter to put a mark upon them and stow them in the ship's hold. That these trunks, containing the ten cases of opium mentioned in the information, were then brought on the Sierra Nevada to this port and here unladen, without a permit, and seized by the collector; and that Ching Sung came over from Victoria on the Sierra Nevada as a passenger, and in conjunction with the claimant made a claim to the trunks when they were seized as aforesaid. These facts show that the opium was brought here from a foreign port and unladen without a permit. This makes a prima facie case for the government, and the burden of proof is thrown upon the claimant "to establish the innocence of the importation, and to repel the supposed forfeiture." 1 Stat. 678; Taylor v. U. S., 3 How. [44 U. S.] 211. To overcome this case and establish his right to the goods, the claimant introduced evidence tending to prove that Ching Sung purchased this opium, on the claimant's account, of Pon Jih, a Chinese merchant in San Francisco, on October 17, 1863; that it was then packed in the two trunks in question and sent to the Chinese house of Lum Wa, where Ching Sung was then buying a general assortment of Chinese goods for the claimant's house in Portland; and that from the house of Lum Wa these trunks were carted with the other goods there purchased to the Sierra Nevada, and shipped for Portland, all the goods being shipped as freight and entered on the ship's manifest, except the two trunks, which were taken by Ching Sung into his stateroom as baggage. That Ching Sung sailed on the ship as a passenger, and upon her arrival at Esquimalt in the forenoon hired a wagon and went up to Victoria and visited the house of a Chinaman called Lum Wa,

taking with him the two trunks with the opium purchased in San Francisco; that while at Lum Wa's, and at his request, Ching Sung opened the trunks and exhibited the opium to the former, when it appeared that the tin boxes or cans in which it was packed were rubbing or breaking one another, to prevent which they took them out of the trunks and repacked them, first wrapping them in newspapers, which proved to be Victoria dailies; that in the afternoon of the same day Ching Sung returned to the vessel in the wagon, bringing with him the trunks and opium, which he attempted to take to his state-room, but was prevented by the freight clerk, who directed them to be stowed in the hold as above stated; and that Ching Sung was a stranger to Lum Wa, but had a letter to him.

This, I believe, is a fair statement of the claimant's case as he claims it to appear from the evidence. How far is it to be believed, considered with reference to its intrinsic probability, or want of it and the known facts and circumstances of the case? The witnesses in support of it, with one immaterial exception, are Chinese. The principal one—Ching Sung—is a partner of the claimants, and pecuniarily interested in the result; besides, being the principal actor in the transaction, he naturally would feel some solicitude for its success. The witness Joe was Ching Sung's companion on the voyage, including the visit to Lum Wa's, at Victoria, and is most probably under the control and influence of the claimant at this time. Lum Wa testifies that the opium was in the trunks when they were brought to his place, but he is contradicted in some important particulars by Dyer, the freight clerk. On the day the Sierra Nevada touched at Esquimalt, Dyer visited Lum Wa's place in search of two packages of opium that were brought up on the vessel on that trip from San Francisco. He found the packages there, and he says they belonged there. In fact, Lum Wa was engaged in importing opium from San Francisco. Dyer also testifies that Lum Wa kept a store, and that he saw Ching Sung and Joe there, in the back room, with these trunks opened, containing these packages of opium, wrapped in Victoria daily newspapers. These are the circumstances that excited Dyer's suspicions, on account of which he directed the trunks to be stowed in the hold. Now, Lum Wa testifies that he kept a wash-house, and did not keep a store. Again, if Lum Wa really did furnish the opium in the trunks to Ching Sung to be smuggled in here, as appears probable, he would naturally feel some interest in the result of the venture, in addition to the sympathy which he may be safely presumed to have for a countryman in trouble. The effect of these circumstances is to place these witnesses before the court somewhat in the light of accomplices. In addition, there is the direct pecuniary interest of Ching Sung in the result, and that the nat-

ural sympathy of all of them for the claimant as against the government.

The only other material witness for the claimant is Pon Jib. He deposes unqualifiedly to the sale of opium to Ching Sung, as alleged in the answer. That it was packed in trunks similar to these, but what became of it he does not know, further than it was sent to the house of Lum Wa, where Ching Sung was making his principal purchases, such as sugar, silks, teas, etc. A drayman of San Francisco also testifies that he hauled goods from Lum Wa's to the Sierra Nevada for Ching Sung, and among the rest these or similar trunks, but what was in them then, if anything, he does not know. The rest of the goods—many of them being valuable in proportion to bulk—were shipped as freight and put upon the manifest, but the trunks were treated as baggage and taken into Ching Sung's state-room. Wilson, the servant who had charge of the state-room during the voyage, testifies that he handled the trunks and set them up on end before reaching Victoria, and that they were a "little heavy, not much"—in effect that they were light. If these trunks, as claimed by the claimant, then contained opium of the value of $1,575, they should have been entered on the manifest and shipped as freight. This circumstance itself is a badge of fraud, unless explained. The omission to do so, tends to show that the opium was not then in the trunks. The freight would have been but a trifle, and the goods would have been equally as safe as in the state-room, and more so. The taking the trunks ashore at Esquimalt is not explained or accounted for on the supposition that they contained this opium at the time. No adequate cause or motive is shown for such an apparently useless act. Nor is there any sufficient reason shown for Ching Sung's visit to Victoria under the circumstances. Lum Wa and he both admit that they had never seen one another before, and were utter strangers to one another. To my mind it is very unreasonable that Ching Sung would hire a wagon and go three miles to Victoria, simply to get his dinner with a stranger, who kept, as he says, a wash-house, while he was a merchant, and had his meals furnished him in his room on shipboard. Yet this is the only reason assigned for the visit. The vessel was only to remain at Esquimalt a few hours, and there would be hardly time to exchange greetings with Lum Wa and eat a dinner of ceremony. But why drag the trunks of opium along? Ching Sung's only reason is, that he was afraid they would be stolen if left in his room. The reason is not satisfactory. It is destitute of probability, and is evidently an afterthought.

This is the evidence of the claimant and upon its face it is improbable if not untrue.

But the testimony of Parker, the officer of the customs who made the seizure, tends strongly to show that the answer to this alleged forfeiture is substantially false. The testimony of Mr. Parker is direct and positive, and notwithstanding the criticisms of counsel, I think entitled to full credit. The suggestion as to his interest in the forfeiture is answered by the fact that he is not entitled to any share of a forfeiture in a case where he is a witness. He states, that on the way up the Columbia river, Dyer communicated to him what he saw at Lum Wa's, and his subsequent suspicions, and said he would point out the trunks to witness when they reached Portland. When the trunks were put upon the wharf, Parker asked to whom they belonged. Ching Sung, who was present, claimed them. Wha Kee was also present. Parker asked them what the trunks contained. Both answered positively and unqualifiedly: "Bedding and clothing from San Francisco." The two Chinamen being then about to take the trunks away, Parker bade them desist and questioned them further. They repeated the statement that the trunks contained the bedding and clothing of Ching Sung. Parker then lifted one of the trunks, and finding it quite heavy for its size, ordered them to be opened. Wha Kee went up town for his keys, and on his return opened one of the trunks, which, in the language of the witness, "presented to view a soft, light, elastic bed-cover or comforter." Upon this, Wha Kee threw up his hands and exclaimed: "There, see!"—evidently intending, as Mr. Parker says, to convey the impression, that the fact was just as they had said, that the trunk contained "bedding and clothing." But Parker's faith was weak, and lifting up the bed cover he exposed the cases of opium to view. Wha Kee then admitted that the cases in the trunks contained opium, and when asked how they came to be wrapped in Victoria newspapers, he replied that "they—the papers—had been sent to San Francisco." Thereupon Parker took the trunks into his possession, and Wha Kee went away. About half an hour afterward he returned with an attorney, and upon some one suggesting that the trunks had been taken ashore at Victoria, unpacked, and the cases there wrapped in Victoria papers, Wha Kee at once caught at the suggestion, and said that was the fact, repeating the statement at length.

It is not necessary to comment upon the further portion of Parker's testimony, wherein he details a conversation between himself and Wha Kee, in September of 1863, in which Wha Kee, as Parker understood, sought to convince the witness that he could make money by letting opium pass the Astoria custom house as soy, or "by shutting his eyes." Parker might have misunderstood his drift. Besides, I am afraid that the experience of the Chinese on this coast would naturally lead them to the conclusion that in their business relations or intercourse with American officials, the use of money was a lawful means on any and

every occasion, and that what was so often exacted from them upon one false pretense and another, might without any impropriety be offered when a favor was asked.

The facts stated are sufficient for the decision of the case. The government has made out a plain prima facie case. The claimant has failed to overcome it; and not only that, but upon his own showing it is highly probable that the whole arrangement, from its inception, was a scheme to purchase opium of Lum Wa and ship it to Portland as a purchase made in the United States—at San Francisco—and upon which the duties were therefore supposed to be paid. The letter to Lum Wa is accounted for upon this supposition, and the whole transaction at Victoria admits of no other reasonable explanation, particularly when it is remembered that Victoria is a free port, to which opium is shipped out of bond from San Francisco in large quantities, and there sold without the payment of duties.

I am loth to conclude that Pon Jib has intentionally sworn falsely in this matter. His character for truth and veracity is testified to by three white men of San Francisco. He may have sold opium to Ching Sung, as he states; but if so, it must have been a part of the preparation of appearances by Ching Sung. The opium purchased of Pon Jib, if any, might have been left at Lum Wa's, and then Ching Sung having thus made it appear that there was opium in his trunks, might start with them in fact empty for Victoria and free opium.

I have been thus particular in examining this case upon the facts, more for the purpose of showing that this forfeiture is morally just, than otherwise. But, as a matter of law, the government is entitled to a judgment of condemnation, even if the facts were exactly as claimed by the claimant. Supposing that the opium was purchased in San Francisco, having afterwards been voluntarily landed at a foreign port, it then lost its former character or status. When the opium was brought back from Victoria, and placed on board the Sierra Nevada, and thence transported to this port, it was a technical importation of goods from a foreign port or place, and therefore such goods could not be unladen without a permit. The words of the statute are plain and comprehensive: "No goods, wares or merchandise, brought in any ship or vessel from any foreign port or place, shall be unladen," etc. It is said that this permit is a mere technical regulation. So it is, in itself; but in effect it is a means to enable the officers of the customs to have inspection of all goods brought from foreign ports, and collect the revenue, if any, due thereon. If goods once admitted into the United States from a foreign port are re-exported, the effect of such admission ceases, and if such goods are attempted to be reimported into the United States, they must be taken to be what they are in fact—goods then brought into the United States from a foreign port or place, and not to be landed, on pain of forfeiture, without a permit. The time which the opium remained in Victoria, after being landed from the vessel, is not material. If one year would be sufficient to separate the goods from the vessel and place them within the foreign jurisdiction, so may one day or one hour be. It is not a question of time, but of what was done with the goods. If they were practically separated from the ship and the control of its officers as a part of her cargo, and voluntarily placed within the limits and jurisdiction of the government of the foreign port of Victoria, as I think they were, they could not be afterwards brought to Portland and landed without a permit. They would come within the category of the act—"goods brought from a foreign port." Acts declaring forfeitures and imposing penalties for violations of the revenue laws must be construed so as to accomplish the object for which they were intended. In the technical sense, they are not penal, but rather remedial—intending to effect a public good and prevent frauds. Taylor v. U. S., 3 How. [44 U. S.] 210.

Counsel for the claimant, assuming that this opium paid duty in San Francisco, sought to have it considered upon the footing of goods, the growth or manufacture of the United States, coming from a foreign port. But if the analogy would hold good, it would not help the claimant's case. Goods, the growth or manufacture of the United States, cannot be brought from a foreign port into the United States, and unladen without a permit, nor without evidence of their exportation and that they are in the same condition as when exported. In Knight v. Schell, 24 How. [65 U. S.] 526, the plaintiffs manufactured at Newberg, N. Y., a number of barrels, and shipped them in three vessels to Cuba, where they were unladen and filled with molasses, when they were re-laden upon the same vessels and brought to New York. The defendant being collector at the time, charged the barrels with the regular duty—24 per centum—upon their value at Cuba. The plaintiffs paid the duties under protest and then brought an action against Schell to recover them back. The court decided against the plaintiffs—holding that the barrels were not returned in the same condition as when exported. Mr. Justice Clifford, in delivering the opinion of the court, says: "When filled in the foreign port, the barrels have been applied to the commercial use for which they were manufactured; and when shipped with their contents, brought back to the United States, and are offered with their contents by the importer for entry at the custom house, they have then, in respect to the revenue laws of the United States, acquired a new character." So with foreign goods once lawfully introduced into the United States,

if taken out of the country and landed at some foreign port or place, "in respect to the revenue laws of the United States, they have acquired a new character." They must pay duties as upon an original importation, and to this end. it is forbidden to land them without a permit. That is this case, even upon the ground which counsel for the claimant seeks to put it.

But this is a more favorable view of the transaction than the facts warrant. I do not think Ching Sung purchased this opium in San Francisco, but in Victoria, and that it never paid duties to the United States. If the fact were otherwise, and it had been innocently landed at Victoria and then brought to Porland in ignorance of the law, Wha Kee and Ching Sung would naturally have answered Parker according to the fact, when asked by him what the trunk contained. Instead of this they prevaricated and sought to make the impression that the trunks contained nothing but "bedding and clothing,"—thus betraying a consciousness of something wrong in the matter and a purpose to conceal it from the officer.

In accordance with these views the court finds as a conclusion of fact that the opium in the information mentioned was, on October 22, 1863, brought to Portland, in the district of Oregon, from the foreign port of Victoria, and here unladen contrary to the statute without a permit, and as a conclusion of law that the said opium thereby became and is forfeited to the United States.

Judgment, condemning the goods as forfeited to the United States.