## KIDD et al. v. FLAGLER.

(Circuit Court, N. D. New York. March 2, 1893.)

No. 2,583.

1. CUSTOMS DUTIES—REIMPORTED LIQUOR WITHDRAWN FROM BOND.

> Where a person has removed liquor from a bonded warehouse to Canada without paying the internal revenue tax, and landed it, and permitted it to remain there for a month, he is entitled to bring it back to the United

States on payment of duty equal to such tax, as provided in Rev. St. § 2500, notwithstanding that he intended, when he sent it to Canada, to bring it back again.

**2. SAME—"EXPORT" DEFINED—INTENT.**

The word "export," as used in the customs laws, means the taking of goods out of one country into another, and there unlading them; and it is entirely immaterial whether or not the owner intends to bring them back again. It is the converse of "import."

At Law. Action by George W. Kidd and others against Benjamin Flagler, as collector of customs, to recover damages for illegal detention of imported goods. Verdict for defendant. Motion for a new trial. Granted.

Statement by COXE, District Judge:

In 1884 the plaintiffs were manufacturers of distilled spirits. Their distillery was at Des Moines, Iowa. Their principal place of business was at New York city. The defendant was collector of customs at Suspension Bridge,. N. Y. The action was brought to recover damages of the defendant for detaining, for over two months, 65 puncheons of spirits belonging to the plaintiffs. In July, 1884, the plaintiffs withdrew this property from their bonded warehouse at Des Moines, for export to Canada, (section 3330, Rev. St.) without paying the internal revenue tax of 90 cents per gallon, intending to remove it to New York and pay the tax there. The route by which they proposed to send the property was to Detroit and thence to New York, via Windsor, Can., and Suspension Bridge. The property arrived at Windsor on the 12th of July, 1884. It was taken out of the cars, measured by the Canadian officials and placed in a warehouse under the charge of the Canadian customs officers, where it remained in bond until August 16, 1884. No duty was paid to the Canadian government. On the 16th of August, it was shipped from Windsor, invoiced to the collector of the port of New York for the benefit of the plaintiffs. The cars in which it was placed for shipment were under the seal of the consul of the United States at Windsor. It reached Suspension Bridge on the 18th of August, 1884, where it was detained by the defendant, acting under instructions from the secretary of the treasury.

The plaintiffs insist that they had a right to bring the property back to the United States upon paying a duty equal to the revenue tax upon it at Des Moines. They claimed this right under section 2500 of the Revised Statutes, which provides: "Upon the reimportation of articles once exported, of the growth, product, or manufacture of the United States, upon which no internal tax has been assessed or paid, or upon which such tax has been paid and refunded by allowance or drawback, there shall be levied, collected, and paid a duty equal to the tax imposed by the internal revenue laws upon such articles." The defendant insisted that the property had not been properly withdrawn from the warehouse at Des Moines and exported to Canada and that he had a right to detain it for that reason. The jury found that it was not the intention of the plaintiffs at the time the property was sent from Des Moines to Windsor to deal with it at Windsor as Canadian property. On the contrary, it was their purpose to pass it through Canada in order that they might pay the revenue tax at New York rather than at Des Moines. Some of these facts are admitted and others were established by the verdict of the jury. None of them can be questioned on a motion of this character, which proceeds upon the theory that the plaintiffs are entitled to recover non obstante veredicto.

Matthew Hale, for the motion.

D. S. Alexander, U. S. Atty., and Frank C. Ferguson, Asst. U. S. Atty., opposed.

COXE, District Judge, (after stating the facts.) The main question is one of law. It is this: Is a person who has, pursuant to

law, removed property to Canada, landed it and permitted it to remain there for a month, entitled to bring it back to the United States on payment of the duty provided in section 2500, notwithstanding the fact that he intended when he sent the property to Canada to bring it back again to this country? Still further simplified the question is, was the plaintiff's property exported? It is perfectly plain, if the owners' intent as to the ultimate disposition of the property is not an element in determining this question, that section 2500 is applicable.

The defendant maintains that if the owners intended to bring the property back, it was not exported. The plaintiffs assert that the question of intent has no bearing whatever upon the point at issue. The dictionary meaning of the term "export" is as follows: "To carry from a state or country, as wares in commerce." Webst. Dict. "To send goods and merchandise from one country to another." 1 Bouv. Law Dict. 502; 1 Rap. & L. Law Dict. 487. The term is the direct converse of "import," which means, "to bring into a country merchandise from abroad." These terms, as they appear in revenue and customs laws, have frequently been considered by the courts and their meaning judicially determined. Some of these decisions are as follows: "The term used is 'import' and legislation employed that term in its commercial sense, which is to 'bring' from a foreign jurisdiction, into this jurisdiction, merchandise not the product of the country. Its commercial meaning is directly contrary to the term 'export.' Both phrases have a technical meaning in the law. We 'import' teas from China, wines from France. We 'export' cotton, tobacco, pork and wheat. The one term signifies etymologically 'to bring in,' the other 'to carry out.'" The Forrester, 1 Newb. Adm. 81. "The purpose of the drawback provision is to make duty free, imports which are manufactured here and then returned whence they came or to some other foreign country,—articles which are not sold or consumed in the United States." Campbell v. U. S., 107 U. S. 407, 413, 2 Sup. Ct. Rep. 759. "The literal meaning of 'importation' is to bring in with intent to land." Kohne v. Insurance Co., 1 Wash. C. C. 158, 165. An importation means "a bringing into some port, harbor or haven with an intent to land the goods there." The Mary, 1 Gall. 206. Importation takes place when the vessel arrives at a port of entry intending there to discharge her cargo. U. S. v. Vowell, 5 Cranch, 368; McLean v. Hager, 31 Fed. Rep. 602; U. S. v. 10,000 Cigars, 2 Curt. 436; Arnold v. U. S., 9 Cranch, 104; Meredith v. U. S., 13 Pet. 486; Clarke v. Clarke, 3 Woods, 408; Barrett v. Railroad Co., 2 Man. & G. 155; Two Thousand Tin Cans, 7 Ben. 34.

It will be observed that in none of these definitions is exportation made to depend upon the purpose of the owner regarding the disposition of his goods after they have been landed in a foreign country. No authority has been cited by the defendant's counsel or found by the court holding that an intent that the goods shall remain in the foreign jurisdiction is necessary to complete exportation. Indeed, it would seem almost impossible to administer the customs laws if such an inquiry were pertinent in every case. The

collector could seize goods upon the pretext that the intent of the exporters ultimately was to bring them back again, whether they have been in a foreign jurisdiction one month, or one year, or twenty years. The authorities seem to be unanimous on the point that merchandise is exported from this country when it is landed in a foreign country. So, when the puncheons in question were unloaded from the cars at Windsor they became "imports" in Canada, and the moment they became "imports" there they became "exports" here.

Section 3330, as amended by the act of June 9, 1874, (18 St. at Large, p. 64) recognizes the fact that goods are exported when they are unloaded at the foreign port. It says: "That the bond required to be given for the landing at a foreign port of distilled spirits shall be canceled upon the presentation of satisfactory proof and certificates that said distilled spirits have been landed at the port of destination named in the bill of lading or any other port without the jurisdiction of the United States." It does not add: "Together with proof that the owner does not intend to reimport said spirits to this country."

When the government receives proof that the goods have been landed in a foreign country, it is satisfied that they have been exported, and cancels the bond. Such proof was given in this case, the collector, under date of September 24, 1886, certifying as follows: "I hereby certify that proof of landing in Canada of the following described shipments of spirits has been received at this office, and that the exportation bonds covering said goods have been canceled." Here is an express admission on the part of the collector that the plaintiffs have fully performed their agreement to export the goods. In a transaction of this kind between individuals the party making such an admission would be estopped from asserting that the goods were not exported.

The court cannot resist the conclusion that the plaintiffs fully complied with the law permitting the exportation of distilled spirits, that they did export the 65 puncheons in question to Canada, and that they had a right to reimport them under section 2500. It follows, of course, that the defendant's action in detaining them for the reason assigned by him, that they were not exportations, was without warrant of law. A common-sense construction of section 2500 would seem to be that the owners of domestic goods liable to pay an internal revenue tax may, if they find it for their interest, take such goods out of the country without paying the tax; if, however, at any time, they see fit to bring them back again they can do so on paying the tax. In other words, taxable domestic goods consumed here must pay the tax. The United States is only concerned in the collection of this tax. When it is paid the government has no further interest in the property. The United States loses nothing by the reimportation of the goods, and if the owners can gain anything by temporarily exporting them, why should the government be eager to deprive its citizens of this lawful and legitimate advantage? It should rather be a matter of satisfaction. The plaintiffs were at all times ready to pay the internal revenue tax. After the return of the spirits the tax was payable in New York instead of

Des Moines. The government should have received the amount of the tax. The plaintiffs had committed no fraud and there was nothing to justify the treatment they received.

The verdict must be set aside and a new trial granted.