MOORE DRY GOODS CO. *v.* UNITED STATES (No. 2192).[1]

REIMPORTATION.

Goods which had previously been imported into the United States were shipped to Russia, and, by reason of the financial inability of the consignee, after remaining there in customs custody for a number of months, were redelivered to the consignor who reshipped them to the United States. These circumstances constituted an exportation to Russia and an importation from Russia, and the goods were subject to duty when they came into the United States.

United States Court of Customs Appeals, March 17, 1923.

APPEAL from Board of United States General Appraisers, Abstract 44947.

[Affirmed.]

*Frank L. Lawrence* (*T. T. C. Gregory* and *Clarence Coonan* of counsel) for appellant.
*William W. Hoppin,* Assistant Attorney General (*Charles D. Lawrence* and *Bernard Hahn,* special attorneys, of counsel), for the United States.

[Oral argument January 25, 1923, by Mr. Charles D. Lawrence.]

Before MARTIN, Presiding Judge, and SMITH and BARBER, Associate Judges.

MARTIN, Presiding Judge, delivered the opinion of the court:

In the early months of the year 1920 the appellant shipped a large stock of dry goods, valued at about $200,000, from San Francisco to Vladivostok, Siberia. The goods were consigned under a contract of sale to certain merchants of the latter city, and drafts with appropriate shipping documents attached were drawn upon the consignees for the price of the merchandise.

---

[1] T. D. 39531.

The goods arrived at the port of Vladivostok and were landed there in customs custody. But at that time a state of political confusion existed in that city, and its financial and commercial affairs were completely disorganized. In consequence of this the consignees were unable to procure funds with which to pay the drafts, and they notified the consignor by cable that it would be impossible for them to take possession of the merchandise either by payment or upon credit.

The goods remained for a number of months in Vladivostok, suffering heavily from pilferage and in great danger of complete loss; but finally through the good offices of our Department of State they were redelivered to the consignor, who reshipped them to San Francisco.

When the merchandise arrived at that port the collector found that it consisted in part of goods which had been manufactured in this country, and these accordingly were admitted free of duty as American goods returned. The residue was composed of goods of foreign manufacture which previously had been imported into this country from abroad. The collector held that these were subject to duty, upon the ground that the transaction just recited amounted to an exportation of the merchandise from this country to Siberia and a subsequent reimportation of it into this country. Accordingly duty was assessed by the collector upon that part of the consignment.

The appellant protested against the assessment, claiming that the transaction in question did not amount in law to an exportation and a subsequent reimportation of the merchandise, and that in fact it was no more than an ineffectual attempt to export the same. In support of this contention the appellant lays stress upon the fact that the goods in question were not actually delivered to the consignees at Vladivostok, but remained all the time in customs custody at that port, and that they never entered into the trade and commerce of that city.

The protest was submitted to the Board of General Appraisers and was overruled. An appeal was taken from that decision.

While we recognize the hardship from which the appellant has suffered under the circumstances, we are nevertheless constrained to agree with the decision of the board. For when the merchandise in question was shipped from San Francisco it was the intention of the consignor, as already stated, to export it to Vladivostok for delivery to certain citizens of that place to whom it had been sold. The consignor did not then entertain any thought of ever reshipping the goods to this country. The goods arrived at Vladivostok, and must have been entered at the customs there, for they were taken in charge by the customs officials of the port. They were not refused the privilege of importation, but were detained in customs custody because of the inability of the consignees to receive them.

For a number of months they remained upon foreign soil and were subject to the control of a foreign government. And when they were reshipped to this country it was by virtue of an export license issued by that government.

We think that these facts lead to the conclusion that the goods in fact and in law were exported from this country and imported into Siberia; and that their return to this country was a reimportation thereof.

In Ten Cases of Opium (23 Fed. Cas. 840, Case No. 13828 [1 Deady 62]) the syllabus reads in part as follows:

2. Foreign goods once lawfully admitted into the United States, if reexported or voluntarily placed within the limits of a foreign jurisdiction, lose the character imparted to them by such admission, and if re-imported into the United States, it must be done in conformity with the law governing the importation of goods of a foreign growth or manufacture from a foreign country.

3. If opium was shipped from San Francisco via the foreign port of Victoria to Portland, and while the ship was lying at Victoria the shipper of the opium should cause it to be taken ashore and placed in a house in Victoria, for even a few hours, or less time, and then cause it to be re-laden upon the ship and brought thence to Portland, such opium would be brought from a foreign port and liable to become forfeited by being landed without a permit.

In Kidd et al. *v.* Flagler (54 Fed. 367) Judge Coxe remarked as follows:

It will be observed that in none of these definitions is exportation made to depend upon the purpose of the owner regarding the disposition of his goods after they have been landed in a foreign country. No authority has been cited by the defendant's counsel or found by the court holding that an intent that the goods shall remain in the foreign jurisdiction is necessary to complete exportation. Indeed, it would seem almost impossible to administer the customs laws if such an inquiry were pertinent in every case. The collector could seize goods upon the pretext that the intent of the exporters ultimately was to bring them back again, whether they have been in a foreign jurisdiction one month, or one year, or twenty years. The authorities seem to be unanimous on the point that merchandise is exported from this country when it is landed in a foreign country. So, when the puncheons in question were unloaded from the cars at Windsor they became "imports" in Canada, and the moment they became "imports" there they became "exports" here.

In the Hazelton case, decided by the Board of General Appraisers November 30, 1900, it appeared that a watch had been imported into this country from Switzerland, duty being paid upon it at importation, and afterwards it was returned to Switzerland to be repaired without charge by means of labor alone, without the addition of any new materials, and to be immediately returned thereafter to the owner in this country; it was held, Judge Somerville writing the opinion, that when the watch was returned to this country it came as a reimported article, and was liable to duty as such. (T. D. 22648–G. A. 4816.)

A situation which should not be confused with the present one has arisen at times when goods have been shipped from this country

for exportation into Canada, and have been denied entry by the Canadian customs officials, because of specific prohibitions in the laws of that country. In such cases when the goods have been returned to this country the question has arisen whether under the circumstances they were liable to duty as reimportations. There has been a divergence of views upon that subject.

On January 27, 1910, in T. D. 30305, the Treasury Department instructed the collectors of customs that where American horses and other animals were shipped for exportation to Canada, and were rejected by the Canadian veterinary officials without being delivered from customs custody in that country, the transaction would be a nonexportation, and the animals when returned to this country would not be subject to tariff duties.

On May 11, 1916 (T. D. 36396) the department ruled that where goods of German manufacture had been shipped for exportation from this country to Canada, and there refused entry because of their enemy origin, the goods when returned to this country should not be assessed with tariff duties.

On the other hand in the Saxon case, T. D. 21476 (G. A. 4515) it was held by the Board of General Appraisers, August 3, 1899, that merchandise transported from New Orleans to Santiago de Cuba, while that place was within the military occupation of the United States, must be deemed to be "exported" from this country. The fact that it is afterwards returned to New Orleans *without having been landed* does not take it out of the category of "imported merchandise," dutiable under the United States tariff laws. In the course of the decision, Judge Somerville, speaking for the board, said:

The vessel seems to have touched at the port of Santiago, where the owners of the merchandise were not permitted to unload it, and the merchandise was returned in the same vessel to the port of New Orleans, whence it had been exported. * * *

Such would be the view of the case if the goods in question could be considered as exported from Santiago by reason of the vessel sailing from that port.

If, moreover, it be admitted that the merchandise was not *exported* in any proper sense from Santiago, but was simply exported from New Orleans, and, after removal beyond the jurisdiction of the United States Government, was reimported in the same vessel, the conclusion must still be reached that the goods are liable to duty. This point was expressly settled by the circuit court of the United States for the district of Maine, in an opinion by Mr. Justice Clifford, in the case of McGlinchy *v.* United States (4 Cliff., 312, s. c. 16 Fed. Cas. 118).

In the Erlanger & Ries case, decided May 22, 1917, T. D. 37197 (G. A. 8065), the board held that merchandise imported into this country from Austria, upon which duty had been paid, then exported to Canada and refused admission into that country under its laws, and then reimported into the United States, is, for tariff purposes, to be treated as an original importation and the proper duty collected thereon.

We do not find that any appeal was taken from the foregoing decisions.

We need not dwell, however, upon the foregoing issue, since the conceded facts in the instant case present an essentially different question. The present merchandise was not denied entry at Vladivostok, nor was its importation into Siberia prohibited by law. But it was reshipped to this country owing to market conditions there, and the consequent inability of the consignees to pay the drafts and receive the goods. It is true that this condition was an unexpected and unexampled one, and that of course it was not caused in the least degree by any fault or imprudence upon the part of the appellant. Nevertheless, in contemplation of the tariff laws, the situation is the same as if appellant had exported goods into a foreign port to its own order, and immediately afterwards had reshipped them to this country, because of changes in market prices which made that the more profitable disposition of the merchandise. We are convinced, therefore, upon principle and authority, that the goods in question when brought again into this country were reimportations in contemplation of the tariff laws, and therefore were liable to assessment as such.

A question is presented by the record with reference to the admissibility of a certain affidavit as evidence in the case. But the question is merely moot, since this decision, as well as that of the board, assumes the facts in the case to be such as are stated in the affidavit.

The decision of the board is *affirmed*.