LOBLAW GROCETERIAS, INC. *v.* UNITED STATES (No. 3819)[1]

[1] T. D. 47481.

480

United States Court of Customs and Patent Appeals, January 7, 1935

*Tompkins & Tompkins* (*J. Stuart Tompkins* of counsel) for appellant.
*Joseph R. Jackson*, Assistant Attorney General (*Charles D. Lawrence*, Special Assistant to the Attorney General, *Ralph Folks* and *Daniel I. Auster*, special attorneys, of counsel), for the United States.

[Oral argument December 10, 1934, by Mr. Tompkins and Mr. Lawrence]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

Three automobile chassis were entered at the port of Buffalo, N. Y., by the appellant, under the Tariff Act of 1922. Duty was assessed thereon by the collector at 25 per centum ad valorem, in accordance with the basic rate fixed by paragraph 369 of the Tariff Act of 1922, together with an additional duty of 10 per centum under the marking statute, section 304 (a) of said act. The importer, in each instance, protested, claiming "that this motor truck chassis was of English origin, and was marked when imported into the United States 'Made in England' and as such was dutiable only at the countervailing rate of 33⅓% ad valorem, authorized in T. D. 41934 of January 8th, 1927." Thereafter, and before hearing, the importer amended his protest by adding:

It is claimed that the merchandise when imported into the United States was duly, sufficiently, and legally marked, and that it was not subject to the additional 10% duty under Sec. 304 (a).
We claim it is dutiable at only 25% under Par. 369 of the Tariff Act of 1922.

In answer to the protest, the acting appraiser reported that the imported merchandise consisted of motor truck chassis originally manufactured in England, shipped into Canada and "reconstructed to such an extent that, practically, they became a product of Canada."

The United States Customs Court sustained the protest, holding that the goods were imported "indirectly" from England, under the language of said paragraph 369; that they were, therefore, dutiable at the countervailing rate of 33⅓ per centum ad valorem, and that they were properly marked with the country of origin and were not dutiable at the additional rate of 10 per centum under the provisions of said section 304 (a). A rehearing was awarded, and the original conclusion was adhered to.

The importer then appealed, and in this court a stipulation of facts was filed, the pertinent portions of which are as follows:

It is hereby stipulated and agreed, by and between the attorneys for the respective parties hereto, that the facts pertinent to this appeal are correctly

stated by the United States Customs Court in its decisions published in T. D. 46760 and Abstract 27788.

It is further stipulated and agreed that the three motor chassis involved in this appeal were originally manufactured in England; that each of said motor chassis was repaired and renovated in Canada prior to importation into the United States with new parts manufactured in England by the same company which had manufactured the motor chassis originally.

That each of said motor chassis was purchased at an average price of $205.88 and the repairs, including parts and labor supplied for each chassis, are as follows:

| Protest No. | Collector's No. | Entry No. | Chassis serial No. | Cost of new parts | Labor |
|---|---|---|---|---|---|
| 523387G | 690 | 2292 | 3364 | $682.50 | $315.00 |
| 523388G | 691 | 2566 | 6759 | 618.66 | 194.26 |
| 523388G | 691 | 2566 | 7792 | 654.60 | 179.04 |

It is further stipulated and agreed that the sole issue raised in the assignment of errors herein is whether for the purpose of determining countervailing duty under paragraph 369 of the Tariff Act of 1922 the merchandise was imported indirectly from England, as held by the United States Customs Court, or was imported from Canada, as claimed by the appellant.

The facts relative to this importation, as gathered from this record, said T. D. 46760, and Abstract 27788, referred to in said stipulation, are as follows:

The three chassis in question were manufactured in England in the year 1914, by the Leyland Motor Co. of Lancastershire. They were sent to France during the World War, and used there. Whether they were fitted with bodies does not appear in the record except by inference. It is presumable that they were then parts of trucks. Whether they were owned by the British Government does not appear. After having been used in France, they were sent to Camp Bordon, at Toronto, Canada, where they were presumably used, but to what extent, or by whom, the record does not show.

For some time prior to the purchase of the same by appellant, it was the practice once each 14 days while "the said trucks" were "standing in camp", to start the engines and run them a while for lubrication, and to prevent rusting of the cylinders. From the fact that in said T. D. 46760 the word "trucks" appears in the decision of the Customs Court, it is assumed that the chassis, at that time, were used as a part of trucks, but by whom, or for whom, does not appear. Several years after the World War, the appellant purchased, at Camp Bordon, 17 second-hand trucks, including the three chassis here involved, at a total price which made the average cost of each chassis $205.88. Thereafter, the appellant overhauled the three chassis at a cost of approximately $1,000 each, including labor and material, the material being imported directly from England, where it was manufactured by the Leyland Motor Co. The appellant pur-

chased these parts from the Canadian branch of the Leyland Motor Co., which imports them from the factory in England.

The appellant has a branch house at Buffalo, N. Y. These three chassis, not fitted with cabs, were driven across the border at Buffalo under their own power.

There are certain other facts in the record relative to the marking of the chassis which need not be recounted here, the issue of marking not being now before us. The parties have stipulated that there is but one issue in the case, and the question of correctness of the ruling of the court below, as to the applicability of the marking statute, said section 304 (a), will not be considered by the court. This leaves for consideration the question: Were the goods imported directly or indirectly from England, or were they imported from Canada?

It is not questioned by counsel that Canada is a "foreign country," within the meaning of section 1 of the said Tariff Act of 1922. See *American Express Co.* v. *United States*, 4 Ct. Cust. Appls. 146, T. D. 33434; *Maier, Morton & Browne* v. *United States*, 11 Ct. Cust. Appls. 115, T. D. 38753.

It must be held that within the ordinary meaning of the word "import," this merchandise was imported from Canada. "Importation * * * consists in bringing an article into a country from the outside." *Cunard S. S. Co.* v. *Mellon*, 262 U. S. 100, 122. See, also, *The Conqueror*, 49 Fed. 99, 102; *United States* v. *Estate of Boshell*, 14 Ct. Cust. Appls. 273, T. D. 41884. Its meaning is the opposite of "export". *Kidd* v. *Flagler*, 54 Fed. 367, 369.

Prior to the enactment of the Tariff Act of 1922, there was ample authority for holding the merchandise in question here to be an importation from Canada and not from England. In *Maier, Morton & Browne* v. *United States, supra,* goods manufactured in England wer sold and delivered to a company at Montreal, Canada. These wer shipped in bond, and were exported to the United States by th Canadian owners without having been taken out of bond, and withou payment of the Canadian import duty. A question arose as to thei appraisement and this court said, speaking through Martin, Judge:

At this point it may be noted that the importers do not claim that these goods were imported into this country from England, nor could such a claim be sustained upon the record. For while it is true that they were manufactured in England, yet they had afterwards become the property of the Canadian company, and had been sold as such to the appellants herein. It must therefore be conceded that they were Canadian as distinguished from English importations when they were entered at the ports of this country. * * *

In *Moore Dry Goods Co.* v. *United States*, 11 Ct. Cust. Appls. 449, T. D. 39531, goods of foreign manufacture were shipped on consignment from this country to Vladivostok, Siberia. Due to unsettled conditions at Vladivostok, the goods could not be delivered and they

were, under export license issued by the authorities at Vladivostok, shipped back to the consignor. They were held subject to duty, as an importation. Here the court took into consideration the fact that when the goods were shipped to Siberia, "it was the *intention* of the consignor * * * to export it to Vladivostok for delivery * * *. The consignor did not then entertain any thought of ever reshipping the goods to this country." (Italics ours.)

Another case of interest in this connection is *United States* v. *American Railway Express Co.*, 11 Ct. Cust. Appls. 505, T. D. 39659. In this case, baskets manufactured in Japan were exported from San Francisco to a purchaser at Chatham, Canada. Without having left customs custody in Canada, they were remanifested there and shipped to the owner at Buffalo, N. Y. They were there assessed for duty, and protest was filed. This court said, in part:

> In respect to the second claim set out in the protest we may say that the shipment of the merchandise from the United States into Canada with the intention of importing it into that country amounted under the circumstances to an exportation thereof from this country. Accordingly when it was shipped again into the United States there was a reimportation thereof, and duty again accrued. The instant case is different in principle from one wherein merchandise may incidentally cross foreign territory while in transit under customs regulations from one port of the United States to another, without any purpose or intent to import it into the foreign country. This merchandise, it will be remembered, was shipped to Chatham as a final destination for the purpose of removing it permanently from the United States and importing it into Canada, and its subsequent reshipment into this country was a transaction wholly independent of the original exportation. We think that in this respect the case is ruled by the recent decision of this court in Moore Dry Goods Co. v. United States (11 Ct. Cust. Appls. 449; T. D. 39531). For a fuller discussion of the subject we refer to that decision and the authorities cited therein.

A case quite in point is *Acker* v. *United States*, 1 Ct. Cust. Appls. 404, T. D. 31481. There champagne, manufactured in France, was sold and exported to a buyer at London, England. There was nothing to show that it was intended to be exported from France to the United States. The United States importer bought the champagne from the English merchant and imported it. The question was: Was it imported from France or from England? It had remained in bonded warehouse in England. This court held the goods to be an importation from England and not from France, saying, in part:

> The intent with which an act is done is many times conclusive of the effect of the act. There is nothing in the record which shows that the intent of Grant & Co. in purchasing the champagne in France and shipping it to London was different than what would ordinarily therefrom be presumed, namely, that it was their intent to import the champagne to England. The fact that it was placed in a bonded warehouse does not change the natural presumption which otherwise obtains because the placing of the same in such warehouse is not inconsistent with an importation to England; the importers had the right to place the same in their own warehouse or in a bonded warehouse at their own election and

any subsequently acquired intent on the part of Grant & Co., if any there were, and none is shown by the record, of treating the original exportation from France to London as one step in an importation to the United States could not change the effect of the first importation to England.

\* \* \* \* \* \* \*

It is claimed by appellant that there is nothing in the reciprocity agreement or the act authorizing it that in terms provides for a direct shipment from France to the United States or that precludes a transshipment in the course of the transmission from France here.

With this we agree, and we do not mean to decide that in proper cases transshipment may not be had in the course of exportation from France to the United States. We do, however, hold that when the merchandise leaves France there must exist an intent to export it from that country to this; that it must be then destined for the United States and intended to enter into and become a part of the merchandise of this country; and it follows that any transshipment in the course of its passage from France here that is consistent with such preexisting intent would be permissible.

It will be observed in this last group of cases decided by this court, we have adverted to the intention of the exporter. While there are expressions in the books that such intent may not be considered (*Kidd* v. *Flagler, supra*) in this jurisdiction, at least, it has been of assistance in the determination in close and doubtful cases.

Certainly, it was the administrative practice to consider the purposes of an exporter. Article 697 of the Customs Regulations of 1923, in force at the times of the entries herein, is as follows:

ART. 697. *Diversion to another country.*—Merchandise imported from one country, being the growth, production, or manufacture of another country, will be appraised at its value in the principal markets of the country from which immediately imported. If it appears by the invoice, bill of lading, or other evidence that the merchandise was destined for the United States at the time of original shipment, it will be appraised at its value in the principal markets of the country from which originally exported.

General Appraiser Somerville, speaking for the board in *In re Booth*, T. D. 22338, 3 Treas. Dec. 585, expressed the view that merchandise manufactured in Germany and Austria, and shipped to Hamilton, Ontario, the original invoices and bill of lading showing Hamilton to be the point of destination, placed in bonded warehouse at Hamilton, and then withdrawn and shipped into the United States, were imported from Canada. The general appraiser commented upon the fact that the goods might have been withdrawn for consumption, at any time, in Canada.

Paragraph 369 of said act is as follows:

PAR. 369. Automobiles, automobile bodies, automobile chassis, motor cycles, and parts of the foregoing, not including tires, all of the foregoing whether finished or unfinished, 25 per centum ad valorem: *Provided*, That if any country, dependency, province, or other subdivision of government imposes a duty on any article specified in this paragraph, when imported from the United States, in excess of the duty herein provided, there shall be imposed upon such article, when imported

either directly or indirectly from such country, dependency, province, or other subdivision of government, a duty equal to that imposed by such country, dependency, province, or other subdivision of government on such article imported from the United States, but in no case shall such duty exceed 50 per centum ad valorem.

The trial court was of opinion that the new language included in this paragraph, "imported either directly or indirectly," should be held to so broaden the scope of this provision, as to include the importation of the goods here involved, as an indirect importation from England. We are, however, unable to agree with this conclusion. For one thing, there is an entire absence of any showing in the record that there was ever any intent, when the goods left England, that they should ultimately enter the United States. They were exported to France, and there, presumably, they entered into the commerce of that country. They were then exported from France to Canada, and became a part of the commerce of the latter country. They were then repaired and rebuilt, the cost of the same being about five times the cost of the chassis, and were exported to the United States. To hold that these goods were imported from England would be equivalent to holding that a resident of Canada might go into a store in Canada, purchase canned goods made in Australia, displayed on the shelves of the store for sale, and then ship them into the United States, and justly claim they were imported into the United States from Australia.

The goods in the case at bar were not imported into the United States from England indirectly, for they were not imported from England at all, but from Canada. Certainly, goods such as those imported here, having entered into the commerce of France and Canada, at a period many years after their exportation from England, cannot be held to be an indirect importation from England under any proper construction of the phrase "imported either directly or indirectly", as used in said paragraph 369.

In view of this conclusion, and in view of the facts appearing from this record, we deem it unnecessary to express any further views as to the precise meaning and scope of the expression "directly or indirectly," as it appears in said paragraph 369.

Having arrived at the conclusion that the goods were imported from Canada, the only remaining query is as to the proper amount of duty to be assessed. The collector assessed the same at 25 per centum ad valorem, under said paragraph 369. The importer claimed, as an alternative ground of protest, the same rate under the same paragraph. It does not appear to have been called to the attention of the collector, counsel, or the trial court that, by virtue of T. D. 41657, 49 Treas. Dec. 1052, there was a countervailing duty of 27½ per centum upon the articles of importation, until application for rehear-

ing was made in the trial court. The trial court having found that the 33⅓ per centum rate was applicable, it was not necessary for the court to decide whether the 25 per centum or 27½ per centum was applicable. That question is now presented for the first time.

The rule as to sufficiency of protests is well stated in *United States* v. *Globe Shipping Co., Inc.*, 19 C. C. P. A. (Customs) 148, T. D. 45262, ı s follows:

A protest is sufficient and may be sustained by the courts when it appears therefrom that, at the time it was filed, or as thereafter duly amended, the importer had in mind the objection to the collector's classification or decision which he afterwards made at the trial, and that it was sufficiently specific, according to the circumstances, to direct the collector's attention to the importer's claims. * * *

This doctrine is fully discussed in many cases, attention being particularly directed to *United States* v. *Sheldon & Co.*, 5 Ct. Cust. Appls. 427, T. D. 34946.

The rule was early announced in this court in *Carter* v. *United States*, 1 Ct. Cust. Appls. 64, T. D. 31033, where a protest claimed etamines to be dutiable under certain named paragraphs, "according to count of threads, weight, value, and condition." Montgomery, P. J., speaking for the court, said, in part:

* * * The means of ascertaining the rate of duty are in the hands of the collector. He has but to examine the goods and make the count of threads, which we understand is customary in any case in order to determine the rate of duty. The real matter of difference between the importer and the collector was that the latter assumed the goods to be etamines, whereas the importer claimed that they were dutiable as cotton cloths at the rate to be determined by the collector himself. To require that the importer should, at his peril, state the number of threads to the square inch when his statement would not be in any way controlling upon the collector would be not to give a liberal or reasonable construction to the statute, but to set a trap for the unwary and perhaps lead to nullifying his protest because of overparticularity.

\* \* \* \* \* \* \*

If the purpose of this notice is to apprise the collector of what the claim of the importer is, and if technical nicety is not to be insisted upon, we think that where the importer protests against the rate assessed and at the same time points out provisions under which he claims the article to be dutiable with sufficient clearness so that the collector may by mere computation or examination of the goods determine their classification, he has complied with the statute in all essential respects.

We think in this case the objections were made sufficiently clear, and that the decision of the Board of General Appraisers should be reversed.

But, if there be limitations in the protest by reason of which it will only apply to one of the articles named in the paragraph, it will be so limited. *Bowling Green Storage & Van Co.* v. *United States*, 3 Ct. Cust. Appls. 309, T. D. 32588.

In *Michelin Tire Co.* v. *United States*, 6 Ct. Cust. Appls. 283, T. D. 35507, a divided court held that a protest was sufficient which directed

the collector's attention to the proper paragraph, without specifying the additional rate of duty which should have been levied thereunder. In that case, the paragraph, paragraph 451 of the Tariff Act of August 5, 1909, provided basic rates for certain kinds of leather, and also provided an additional rate for any of the same which were cut into shoe uppers, vamps,.and other forms. The proper paragraph having been indicated by the protestant, Montgomery, P. J., said:

* * * The real controversy between the Government and the importer was that of whether the importation consisted of skins, dressed and finished, or of band or belting leather. This question was fairly presented. It was then within the power of the collector to reliquidate, while insisting upon the increased rate of duty upon the claim that the goods were cut into forms, and such, it seems to me, was his duty.

Following these authorities, we are of opinion that the protest of the importer under said paragraph 369 was sufficient to indicate that the importer was claiming thereunder; that it was the duty of the collector to assess the basic duty fixed by that paragraph or any countervailing duty applicable thereto at that time; that it was not essential that the importer indicate in his protest what such countervailing rate was; and that the applicable rate was 27½ per centum ad valorem.

The judgment of the court below is, therefore, *reversed*, and the cause is *remanded* with directions to order a reliquidation of the entries at the rate of 27½ per centum ad valorem.