(C. D. 1459)

NASSAU DISTRIBUTING Co., INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided August 14, 1952)

*Klotz & Gould* (*William Whynman* of counsel); *Lane, Young & Fox,* associate counsel, for the plaintiff.

*Charles J. Wagner,* Acting Assistant Attorney General (*Dorothy C. Bennett,* special attorney), for the defendant.

Before Cline, Ekwall, and Johnson, Judges; Cline, J., not participating

Ekwall, Judge: This is a protest against the collector's assessment of duty on certain Swiss wall clocks and spare parts shipped from Mexico to New York on or about May 17, 1949. It is claimed that there had been no *bona fide* exportation of the merchandise to Mexico and that, therefore, there was no importation of the same which would justify the assessment of duty.

At the trial, Otto Peter Kapper, secretary of the plaintiff corporation, was called as a witness for the plaintiff and various documents, hereinafter referred to, were introduced into evidence by plaintiff and by defendant.

According to customs entry No. 731701 (plaintiff's collective exhibit 1), Nastrix Watch Co. imported 1,000 wall watches (or clocks) from Switzerland on or about October 15, 1946, on which duty and internal revenue taxes were paid in the sum of $1,239.67. Mr. Kapper testified that plaintiff corporation and Nastrix Watch Co. were composed of the same partners and that the said wall clocks were purchased by plaintiff, but the papers were made out in the name of Nastrix Watch Co., since that firm had a symbol, as required by Swiss regulations, while plaintiff did not. Payment of duty and taxes was made by plaintiff for Nastrix Watch Co. (plaintiff's collective exhibit 2).

Thereafter, Mr. Kapper arranged to sell 375 clocks out of said shipment to one Sandor Hershey of Mexico City. Mr. Kapper said that it was agreed that the merchandise would be shipped by American Airlines, Inc., c.o.d. and that he did not intend to deliver title or possession of the merchandise without receiving payment. On or about November 20, 1948, plaintiff instructed American Airlines, Inc., to ship the clocks and certain spare parts to Sandor Hershey in Mexico City and to collect for plaintiff the sum of $1,125. The carrier was also directed to insure the merchandise and to collect all charges, including insurance, from the consignee (plaintiff's collective exhibit 3). The following appears on plaintiff's bill of sale (plaintiff's collective exhibit 3):

NO GOODS WILL BE ACCEPTED FOR RETURN WITHOUT OUR WRITTEN CONSENT.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

GOODS DELIVERED TO TRANSIT COMPANIES ARE AT THE RISK OF THE PURCHASER.

Mr. Kapper stated that at the time of shipment an export declaration was made out by his firm and that at that time he did not intend that the goods should be returned to this country. However, about 4 weeks after shipment he was informed that Mr. Hershey refused to pay for the merchandise. According to Mr. Kapper, it remained in the custody of American Airlines, Inc., and no attempt was made

to pay duty. Approximately 6 months later, on or about May 17, 1949, the goods were shipped back to plaintiff in the United States. Plaintiff was billed by American Airlines, Inc., for freight and other charges, including Mexican transportation tax on export, $1.88, Mexican customs handling charge on export, $3.94, and Mexican customs storage charge up to May 14, 1949. $18.55 (defendant's collective exhibit A).

Upon its return, the merchandise was entered free of duty under paragraph 1615 of the Tariff Act of 1930 as American goods returned. The appraiser reported that the clocks were manufactures of Switzerland and duty was assessed by the collector accordingly.

Plaintiff claims that under these circumstances the merchandise had not been exported within the meaning of the law, and consequently there was no reimportation upon which to assess duty.

Exportation has been defined as "a severance of goods from the mass of things belonging to this country with the intention of uniting them to the mass of things belonging to some foreign country." Section 25.15, note 5, Customs Regulations of 1943; *Swan & Finch Co.* v. *United States,* 190 U. S. 143; *United States* v. *The National Sugar Refining Co.,* 39 C. C. P. A. 96, C. A. D. 470. The controlling factor has been held to be the intention of the parties at the time of shipment. *Moore Dry Goods Co.* v. *United States,* 11 Ct. Cust. Appls. 449, T. D. 39531; *United States* v. *American Railway Express Co.,* 11 Ct. Cust. Appls. 505, T. D. 39659; *United States* v. *The National Sugar Refining Co., supra; Fred'k Vietor & Achelis* v. *United States,* 51 Treas. Dec. 11, T. D. 41937; *E. Eugene Rice* v. *United States,* 16 Cust. Ct. 298, Abstract 51179.

In *Moore Dry Goods Co.* v. *United States, supra,* merchandise was shipped from San Francisco to Vladivostok, Siberia, consigned under contract of sale to merchants of the latter city on whom drafts were drawn for the price of the goods. The goods arrived and were landed in customs custody, but, due to the political confusion which existed in the city, the consignees were unable to procure funds to pay the drafts. After remaining in Vladivostok several months, the goods were returned to San Francisco. It was held that the portion of the goods which were of foreign manufacture was subject to duty. The court said (pp. 450–451):

* * * when the merchandise in question was shipped from San Francisco it was the intention of the consignor, as already stated, to export it to Vladivostok for delivery to certain citizens of that place to whom it had been sold. The consignor did not then entertain any thought of ever reshipping the goods to this country. The goods arrived at Vladivostok, and must have been entered at the customs there, for they were taken in charge by the customs officials of the port. They were not refused the privilege of importation, but were detained in customs custody because of the inability of the consignees to receive them. For a number of months they remained upon foreign soil and were subject to the control of a

foreign government. And when they were reshipped to this country it was by virtue of an export license issued by that government.

We think that these facts lead to the conclusion that the goods in fact and in law were exported from this country and imported into Siberia; and that their return to this country was a reimportation thereof.

In the recent case of *United States* v. *The National Sugar Refining Co.*, *supra*, sugar was laden on a vessel in New York for export to St. John's, Newfoundland. The day after sailing, when about 20 miles out at sea, the vessel was in a collision and was so damaged that it returned to New York. Drawback was allowed on that portion of the sugar which had been lost at sea and on that portion which was subsequently exported on the same vessel to St. John's, Newfoundland. Drawback was denied, however, on the portion which was relanded, on the ground that it had not been exported. It was held that the goods had been exported, since they had been carried out of the country with the intention of uniting them with the goods of a foreign country. The court said:

*\* \* \* So long as an immediate bona fide purpose to seek a foreign market coincides with a bona fide act of shipment later changes in either the intent or destination have no effect upon the original character of the act as an exportation.* [Italics quoted.]

In the instant case, it appears clearly that when the goods were shipped to Mexico there was an immediate *bona fide* purpose to seek a foreign market. Mr. Kapper stated at the trial that at the time of shipment it was not his intention that the goods should be returned. The plaintiff's bill of sale (plaintiff's collective exhibit 3) states that the goods were delivered to the carrier "at the risk of the purchaser" and that they would not be accepted for return without plaintiff's written consent. At the same time, an official export declaration was made out and the carrier was directed to transport and insure the goods at the expense of the consignee. The merchandise was actually landed in Mexico and remained there in storage for about 6 months. Apparently it was in Mexican customs custody, since a charge was made for Mexican customs storage.

Plaintiff claims, however, that there was no unconditional and absolute intent on the part of plaintiff to sever such goods from the mass of goods belonging to the United States and to unite them with the mass of goods belonging to Mexico, without payment therefor. However, in *Moore Dry Goods Co.* v. *United States*, *supra*, at the time of shipment, drafts were drawn on the consignees for the price of the goods, and, since they could not pay, the goods were not delivered. Presumably, the shipper did not intend to unite the goods with the mass of goods belonging to the foreign country without payment. Nevertheless, it was held that there had been an intent to export.

Plaintiff relies on a statement in *United States* v. *The National Sugar Refining Co.*, *supra*, that—

\* \* \*  A relanding in this country and the manner of that relanding might in a particular case be the most persuasive evidence of the purported exporter's original intent to export.  In that manner a subsequent relanding might be determinative of the exportation-nonexportation question.  \* \* \*

However, in the instant case, the intention to export at the time of shipment is clear, and the subsequent events do not establish the contrary.

On the record herein, we hold that the merchandise was exported to Mexico on or about November 20, 1948, and that its return on or about May 17, 1949, constituted an importation.  Since the goods were of foreign manufacture, the collector acted properly in assessing duty thereon.

The protest is overruled and judgment will be rendered accordingly.