(A. R. D. 28)

UNITED STATES *v.* H. S. DORF & CO., INC., A/C JOSEPH H. MEYER BROS.

Entry No. 782079.

## Second Division, Appellate Term

(Decided June 4, 1953)

*Charles J. Wagner*, Acting Assistant Attorney General (*Daniel I. Auster*, special attorney), for the appellant.

*Mary Rehan* for the appellee.

### Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: This is an application for review of a decision and judgment of a single judge sitting in reappraisement, wherein it was held that certain white cornaline rods, in chief value of glass, were dutiable at the entered value of $0.60 per kilo. In arriving at that conclusion, the trial court determined that France was the country of exportation of the involved merchandise, and, hence, that the appraised value of U. S. $0.8652 per kilo, net packed, which was based upon a Mexican cost of production, was predicated upon an erroneous theory of law. It was therefore stated that:

> The only evidence in this record bearing on a valuation in France for this merchandise is contained in the invoice and entry, the *bona fides* of which has not been attacked.

> On the basis of the record herein, I find the proper value of the glass rods in question to be the entered value. Judgment will issue accordingly.

Appellant's assignments of error bring up for review, *inter alia*, each of these salient points upon which the trial court's decision rests, and it is urged in the brief in support of this appeal that Mexico, not France, was the country of exportation, or, and alternately, that even if it be conceded that the involved merchandise was exported from France, appellee has failed to establish a statutory value therefor in that country, since the invoice price, standing alone, has no evidentiary value and cannot be accepted as proof of a statutory value.

The record as made before the trial court consists of the oral evidence of Edward Kampa, general manager of Joseph H. Meyer

Bros., hereinafter called Meyer Bros.; defendant's exhibit 1, a photostatic copy of a letter received by said firm from "Univer" Union des Industries du Verre pour l'Exportation, hereinafter called Univer, the French shipper of the instant merchandise; and defendant's collective exhibit 2, a photostatic copy of a report of a customs agent, to which are attached, also in photostatic form, copies of correspondence and documents obtained from the files of Meyer Bros. and from H. S. Dorf & Co., Inc., hereinafter called Dorf of New York, appellee herein.

The facts as revealed by this record are not in dispute. It appears that during the latter part of April 1946, Meyer Bros. ordered from Univer 5,000 kilos of cornaline cane glass to be shipped for its account to Industria de Cristal Plastico, S. A., Coyoacan, D. F., Mexico, hereinafter called Cristal. The order was accepted at a quoted price of $0.60 per kilo, to be filled by Messrs. Guilbert-Martin, the French manufacturer of such merchandise. Owing to the fact that there were no direct shipping facilities between Paris and Mexico, Meyer Bros. advised the shipper to forward the merchandise to the United States for transshipment by Meyer Bros. to Mexico, with which instructions Univer complied.

The merchandise, packed in 50 cases numbered 1 to 50, inclusive, arrived at the port of New York on August 3, 1946, for transshipment to Mexico.

Meyer Bros. forwarded to Dorf of New York the bill of lading and commercial invoice covering said shipment and directed that 25 cases (not involved in this appeal) be sent to Cristal by fast freight, the remaining 25 cases, numbered 26–50, inclusive, to be shipped via water to Vera Cruz, Mexico, for ultimate delivery to Cristal.

Upon receipt of the rail shipment, Cristal began to process the material and, finding that the glass was unsatisfactory for its intended purpose, to wit, the manufacture of glass beads, asked Meyer Bros. not to send the remaining 25 cases. The latter was unable to comply with this request for the reason that the merchandise was then on its way to Mexico, having been laden on the S. S. *Medina*, which sailed from New York on September 27, 1946.

On October 7, 1946, Meyer Bros. advised Dorf of New York to cable Vera Cruz for the return of the 25 cases on board the *Medina*. On October 10, 1946, in compliance with that order, Dorf of New York cabled its Mexican affiliate, Dorf Mexico Co., to hold the shipment, which was described as being then "on the way to Vera Cruz," for return on the next available steamer. Thereafter, but precisely when is not of record, the Vera Cruz branch of Dorf Mexico Co. made application at the customhouse in Vera Cruz for the "devolution" or return of this merchandise, stating that the same was in a bad state, unusable, and shipped to Vera Cruz in error. The Vera

Cruz branch of Dorf Mexico Co. was advised to tender the application to the principal office of customs, the Direccion General de Aduanas, at Mexico City, which it did. Eventually permission to return the merchandise was granted.

In the meantime, and because of a shortage in Mexico of material for making glass beads, Cristal decided to accept the 25 cases which it had hitherto rejected. Meyer Bros. so advised Dorf of New York which thereupon directed its Vera Cruz agent to cancel previous instructions and forward the shipment to Cristal, as originally intended. Because the application to return the merchandise had been filed prior to the receipt of information concerning the change in plans, and because the merchandise had not been declared in Mexico as rods, the Vera Cruz branch of Dorf Mexico Co. felt that it "had no recourse but to re-export it, advising Dorf, New York, of the re-shipment under date of November 20, 1946." Actually, the 25 cases left Vera Cruz on March 3, 1947, and arrived in New York March 16, 1947, where they were entered on a *pro forma* invoice prepared by Dorf of New York.

The trial court adopted the theory that the application of Dorf Mexico Co., the subagent of Meyer Bros. by whose actions the latter was bound, to the Mexican Government for permission to return this shipment to New York, precluded importation of this merchandise into Mexico, and that, therefore, it reverted to its status as a French exportation. Citing as its authority Reap. Circ. 26133, the trial judge stated:

*The application to return the shipment to New York was made while the goods were in transit from New York to Mexico, and when the permission was granted, it must be considered that the merchandise was diverted in transit.* The continuity of the voyage was as follows: The glass rods were manufactured in France; shipped by boat to New York in transit to Mexico; and reshipped by boat from New York to Mexico. While in transit, the shipment was diverted and transshipped back to New York where it finally arrived and entry thereof was made. While it appears that the original intention was to export this merchandise from France and import it into Mexico, the fact is that the goods were never imported into Mexico and did not enter into the commerce of that country. Therefore, the shipment must be considered as an exportation from France and not from Mexico. [Italics supplied.]

It is apparent from the italicized portion of the foregoing that the theory of "diversion in transit," assuming that to be dispositive of this phase of the case, was predicated upon the factual proposition that the application to return and the granting of permission therefor both were events which occurred "while the goods were in transit from New York to Mexico." But the record does not support this construction of the facts. We have carefully examined the record but do not find a time when any of the following occurred: The arrival in Vera Cruz of the vessel carrying the merchandise from New York

to Mexico; the filing of the application for return either in Vera Cruz or in Mexico City; or the granting of permission to effectuate the return. In the absence of such proof, we fail to see how it can be said that the shipment was diverted in transit.

When the merchandise first left New York, destined for Mexico, it was the intention of both the French shipper and the American purchaser that upon arrival in Mexico it was to be taken off the ship and delivered to the ultimate consignee. In other words, at the time of exportation from France, it was not the intention to send these glass rods to the United States, except in transit to Mexico. Insofar as the French exporter was concerned, that intention never wavered. The merchandise was not exported from France to the United States when it arrived in New York on August 3, 1946.

As stated in *United States* v. *G. W. Sheldon & Co. (Damon Raike & Co.)*, 53 Treas. Dec. 34, T. D. 42541, the rule is:

> Merchandise imported from one country, being the growth, production, or manufacture of another country, must be appraised at its value in the principal markets of the country from which immediately imported, unless it is shown that it was destined for the United States at the time of original shipment without any contingency of diversion.

See also *Miramonti Brothers et al.* v. *United States*, Reap. Circ. 1525, affirmed Reap. Circ. 1709.

The query then arises whether a change of intent, upon the part of the American purchaser, not established to have been made known to the proper authorities in Mexico when the merchandise was, in fact, unladen from the vessel at the port of Vera Cruz, may be related back to the French exporter in such a manner as to characterize this transaction as an exportation from France to the United States. We think not, and are of the opinion that the record in its present state is governed by the principle of law found in the case of *United States* v. *American Railway Express Co.*, 11 Ct. Cust. Appls. 505, T. D. 39659. There, some colored wicker baskets were imported from Japan through the port of San Francisco. After certain processing steps, not material here, were undertaken, the San Francisco merchant sold the baskets to an individual who at the time of purchase was a resident of Chatham, in the Province of Ontario, Canada. The baskets were accordingly shipped to that city. While in transit, and, hence, before they arrived in Canada, the purchaser moved to Buffalo, N. Y. Upon arrival in Canada, the merchandise was held in customs custody for a period of 6 days, remanifested under customs supervision, and shipped to the owner at Buffalo, where it was assessed with duty as a reimportation. The court, in sustaining the collector's action, stated in part:

> In respect to the second claim set out in the protest we may say that the shipment of the merchandise from the United States into Canada with the intention

of importing it into that country amounted under the circumstances to an exportation thereof from this country. Accordingly when it was shipped again into the United States there was a reimportation thereof, and duty again accrued. The instant case is different in principle from one wherein merchandise may incidentally cross foreign territory while in transit under customs regulations from one port of the United States to another, without any purpose or intent to import it into the foreign country. This merchandise, it will be remembered, was shipped to Chatham as a final destination for the purpose of removing it permanently from the United States and importing it into Canada, and its subsequent reshipment into this country was a transaction wholly independent of the original exportation. We think that in this respect the case is ruled by the recent decision of this court in Moore Dry Goods Co. v. United States (11 Ct. Cust. Appls. 449; T. D. 39531).* * *

Implicit in the court's decision are findings that, after the original importation, the merchandise was exported from the United States, imported into Canada, exported from Canada, and reimported into the United States; and that the country from which it was exported, before arriving at Buffalo, was Canada, and not Japan. The parallel between the instant case and the cited one is clearly apparent.

In the case of *Kidd et al.* v. *Flagler*, 54 Fed. 367, reversed on other grounds, *Flagler* v. *Kidd et al.*, 78 Fed. 341, the court stated:

It will be observed that in none of these definitions is exportation made to depend upon the purpose of the owner regarding the disposition of his goods after they have been landed in a foreign country. No authority has been cited by the defendant's counsel or found by the court holding that an intent that the goods shall remain in the foreign jurisdiction is necessary to complete exportation. Indeed, it would seem almost impossible to administer the customs laws if such an inquiry were pertinent in every case. The collector could seize goods upon the pretext that the intent of the exporters ultimately was to bring them back again, whether they have been in a foreign jurisdiction one month, or one year, or twenty years. The authorities seem to be unanimous on the point that merchandise is exported from this country when it is landed in a foreign country. So, when the puncheons in question were unloaded from the cars at Windsor they became "imports" in Canada, and the moment they became "imports" there they became "exports" here.

See also the case of *United States* v. *The National Sugar Refining Co.*, 39 C. C. P. A. (Customs) 96, C. A. D. 470, wherein we find the following:

The question before this court, i. e., the meaning of the word "exportation" as used in section 313 (a) of the tariff act, may not be disposed of by any mere abstract consideration of the word, but its significance must be determined with reference to the text of the act in which it appears and with reference to the purpose of the pertinent section of that act.

\*　　\*　　\*　　\*　　\*　　\*　　\*

So far as we have been able to determine both the courts and the customs officials have uniformly defined the legal notion of exportation as a severance of goods from the mass of things belonging to this country with an intention of uniting them with the mass of things belonging to some foreign country. We have found no case wherein the necessity of a foreign landing was considered and hence have found no decision on that question.

The foregoing definition, so far as we are aware, first appeared in an opinion of the Solicitor General of the United States which was approved by the Attorney General in 1883 and is found in 17 Op. Attys. Gen. 579. It was the opinion of the Solicitor General that all exportation thus defined was attended with the chance that the intention might be changed after removal from this country, but that such change had no effect upon the character of the act. *So long as an immediate bona fide purpose to seek a foreign market coincides with a bona fide act of shipment later changes in either the intent or destination have no effect upon the original character of the act as an exportation.* [Italics quoted.]

Likewise, the case of *Moore Dry Goods Co.* v. *United States*, adverted to by the Court of Appeals in the *American Railway Express Co.*, case, *supra*, has a bearing upon the issue here raised. There, a shipment of dry goods, part of which consisted of imported merchandise, was sent from the United States to Vladivostok, Siberia. Owing to unsettled business conditions there, the consignees were unable to accept the drafts drawn against them for the merchandise and notified the shipper accordingly. Ultimately, the merchandise was returned to the United States, where it was again assessed with duty. The court upheld the assessment, stating:

While we recognize the hardship from which the appellant has suffered under the circumstances, we are nevertheless constrained to agree with the decision of the board. For when the merchandise in question was shipped from San Francisco it was the intention of the consignor, as already stated, to export it to Vladivostok for delivery to certain citizens of that place to whom it had been sold. The consignor did not then entertain any thought of ever reshipping the goods to this country. The goods arrived at Vladivostok, and must have been entered at the customs there, for they were taken in charge by the customs officials of the port. They were not refused the privilege of importation, but were detained in customs custody because of the inability of the consignees to receive them. For a number of months they remained upon foreign soil and were subject to the control of a foreign government. And when they were reshipped to this country it was by virtue of an export license issued by that government.

Neither did Mexico refuse to the merchandise at bar the privilege of importation. The granting of permission to export presupposes that during the period after the cargo was discharged from the vessel the merchandise was detained in customs custody, subject to the control of the Mexican Government. The payment of export duties and fees for customhouse entry and release, for which items Dorf Mexico Co. charged Dorf of New York (defendant's collective exhibit 2), confirms this view.

Accordingly, we are constrained to hold that Mexico, and not France, was the country of exportation. There being no evidence in the record relating to a value in Mexico different from that found by the appraiser, the same is hereby sustained. This conclusion renders unnecessary any consideration of appellant's assignments of error relating to the sufficiency of the invoiced and entered values, standing alone, to support the finding of the trial court.

We therefore find that:

1.   The merchandise herein involved consists of 2,500 kilos of white cornaline glass rods, packed in cases numbered 26 to 50. It was entered at a value of $0.60 per kilo, net packed, and appraised at $0.8652 per kilo, net packed.

2.   The involved merchandise was exported from France, via the United States, to Mexico, and there imported.

3.   The same was subsequently exported from Mexico to the United States.

4.   The appraised value is predicated upon a Mexican cost of production.

5.   There is no evidence in the record showing or tending to show a value in Mexico, at the time of exportation, different from that found by the appraiser.

We therefore conclude:

1.   That Mexico is the country of exportation.

2.   That the value as found by the appraiser has not been overcome.

3.   That the judgment of the court below should be reversed.

Judgment will be entered accordingly.