(Reap. Dec. 8309)

H. J. HEINZ COMPANY v. UNITED STATES

Entry Nos. 739 and 957.

(Decided April 21, 1954)

*Jerome G. Clifford* for the plaintiff.

*Warren E. Burger*, Assistant Attorney General (*Chauncey E. Wilowski* and *Samuel D. Spector*, trial attorneys), for the defendant.

JOHNSON, Judge: These reappraisements involve the proper value for duty purposes of certain tomato pulp, the product of France, which was shipped to this country from England. The first shipment, entry 739, exported December 7, 1950, was described as F–1 and F–5, 10- x 5-kilo tins, and invoiced and entered at sterling 114–6–3 per 1,000 kilos, net packed, and as F–2, 6- x 5-kilo tins, invoiced and entered at sterling 101–17–3 per 1,000 kilos, net packed. In the second shipment, entry 957, exported February 7, 1951, both the F–1 and F–5, 10- x 5-kilo tins, and F–2, 6- x 5-kilo tins, were invoiced at sterling 91–0–0 per 1,000 kilos, and the same were entered at sterling 101–0–0 per 1,000 kilos. The F–1 and F–5, 10- x 5-kilo tins, were appraised at sterling 133–8–0 per 1,000 kilos, and the F–2, 6- x 5-kilo tins, were appraised at sterling 118–13–0 per 1,000 kilos, packed.

Counsel for the plaintiff introduced in evidence five affidavits. The affidavit of Alan McWilliam, manager of the crop contracts department of H. J. Heinz Co., Ltd., of London, England, discloses that he is

familiar with the tomato and tomato products wherever produced for the Heinz companies, and with the facts, circumstances, and details of the production of the 35 tons of tomato pulp shipped in December 1950 by Heinz of London to Heinz of Pittsburgh, and the 175 tons of tomato pulp shipped by Heinz of London to Heinz of Pittsburgh in February 1951, the subject of consumption entries 739 and 957. Being personally familiar with the tomato pulp and the prices of tomato pulp in France, Italy, England, and the United States, and the uses of tomato pulp and other tomato products, the affiant stated that no tomato pulp of any kind, and no commodity like or similar to or of the same general character or class as the tomato pulp the subject of the shipments in question, had been commercially produced in England at any of the times herein, prior thereto, or since; that the tomato pulp requirements of England and the United Kingdom were imported from France, Italy, Spain, and Portugal; that such pulp is known as the English home consumption tomato pulp.

According to affiant, said English home consumption tomato pulp is used by other tomato product manufacturers in England for the same purposes as that of Heinz. However, the price of the Heinz tomato pulp is higher because of its superior quality, and, although the Heinz pulp could be beneficially substituted in the products of the English manufacturers, the English home consumption pulp would not be an acceptable substitute for Heinz tomato pulp, for the reason that said product used by Heinz was produced from carefully selected tomatoes, carefully cleaned, trimmed, and washed; that it was manufactured during the height of the season so as to produce a good, red, ripe tomato color pulp with a good, sweet tomato flavor, free of all bitter, fermented, scorched, metallic, or other off flavor, and free from particles of seed, skin, leaves, or other extraneous matter, whereas with the English home consumption tomato pulp such extra precautions are not carried out, with the consequence that the color, flavor, and consistency thereof does not measure up to the standard of quality of the Heinz tomato pulp.

It also appears in the affidavit that the English home consumption tomato pulp on the dates in question was freely offered for sale and sold in England for home consumption, without restriction or limitation of any kind; that in the usual course of trade offers were made and prices were quoted in quantities of 50 kilos, the prices being the same regardless of quantity. On December 4, 1950, according to affiant, the freely offered for sale price in the English market was 88 shillings per 50 kilos, and on February 5, 1951, the price was 84 shillings per 50 kilos; and that such pulp was not freely offered for sale for export.

Further, it is clear from affiant's statement that the tomato pulp in question was produced and shipped for the sole and exclusive use

in the manufacture of Heinz companies products and was not freely offered for sale or sold in France or in England, and that Heinz tomato pulp or similar quality pulp, imported into the United States, has not heretofore been and is not now freely offered for sale or sold in the United States.

The affidavit of F. G. Crabb, treasurer, controller, and a director of H. J. Heinz Co., Ltd., London, England, stated, with reference to the tomato pulp in question, that the 35 tons shipped in December 1950 were taken from stocks of tomato pulp imported by said Heinz from France in various shipments during September, October, and November 1950; 5 tons from Barbier-Dauphin F.1; 25 tons from Aime Bernard F.2, and 5 tons from Brun et Reynaud F.5; that the 175 tons shipped to Heinz in Pittsburgh were purchased as follows: 75 tons from Barbier-Dauphin F.1; 100 tons from Aime Bernard F.2; and all shipped to London, England, where it was immediately placed in bond and remained continuously in bond until laden aboard the SS. "American Importer" for transshipment to H. J. Heinz Company of Pittsburgh on February 5, 1951, and no entry thereof for customs purposes was made and no duty was paid thereon in England.

The affiant further disclosed that the invoice price of the 35 tons included the price paid to said producers, plus ad valorem duty of 10 per centum assessed on entry in England, plus clearance and cartage charges to Harlesden, England, plus cartage to the docks and loading aboard the SS. "American Leader"; and that said duty, costs, and expenses comprise the entire costs, charges, and expenses incident to said shipment from the time of its arrival in England to the time it was placed aboard the SS. "American Leader" for transshipment to the United States.

The invoice price of the 175 tons, according to affiant, includes the replacement cost of the pulp to Heinz of London, rental of bonded barges, the various handling charges and expenses incident to the loading of the tomato pulp aboard the SS. "American Importer" for transshipment to Heinz of Pittsburgh, and said costs, charges, and expenses comprise the entire costs, charges, and expenses incident to this shipment from the time of its arrival in England to the time it was placed aboard the SS. "American Importer."

To the best knowledge of affiant, no tomato pulp of any kind or any commodity like or similar to or of the same general character or class as the tomato pulp in question had been commercially produced in England.

Exhibits 3, 4, and 5 consisted of affidavits of Aimé Bernard, André Raynaud, and Pierre Mainguy, director of Barbier & Dauphin, the French producer of the tomato pulp in question. These affiants stated what the cost of production of said tomato pulp supplied by them would have been if shipped on December 4, 1950, and

February 5, 1951. For reasons hereinafter set out, details of these affidavits will not be discussed.

The Government introduced in evidence a report of Charles Schlager, Treasury representative, relative to the two shipments in question. He reported that he visited the office of H. J. Heinz & Co., Ltd., at London and interviewed Mr. Esslemont, director; Mr. Bentley, controller, and Mr. Pollock, cost accountant, and made a personal inspection of the regular books of account and other records. He stated that the shipments had been paid for according to the invoice totals and that the sale was simply as an accommodation until arrangements could be made for shipments direct from France to Pittsburgh; that none of the pulp shipped to the United States was originally ordered for the importer. The method used in figuring invoice prices was explained to the Treasury representative, and certain correspondence and other data relative to the purchase price of the merchandise were attached to the report. The report fully accords with the affidavit of the controller treasurer, heretofore set out. The report does not disclose any data upon the foreign or export value or the cost of production of the merchandise in England.

United States Appraiser Burr testified on behalf of the plaintiff, in rebuttal, that he appraised the merchandise upon the basis of the cost of production, section 402 (f), Tariff Act of 1930; that, in making such appraisal, the English exporter was treated as a constructive manufacturer; and that the appraised values represented the cost of production in England.

Counsel for the plaintiff contends that the correct dutiable value is the foreign market value of "similar" merchandise under section 402 (c), as amended, to wit, 88 shillings per 50 kilos for the merchandise involved in entry number 739, and 84 shillings per 50 kilos for the merchandise involved in entry number 957. Alternatively, it is contended that the statutory cost of production, as evidenced by the affidavits of the French producers, in the absence of a foreign value, is the proper value to be adopted as the value of the merchandise rather than the appraised value.

Counsel for the plaintiff argues that the evidence confirms the finding of the appraiser that there is no statutory foreign, export, or United States value for "such" merchandise, but it does not support the appraiser as to the absence of "similar" merchandise in the English market, inasmuch as the English home consumption tomato pulp is freely offered for sale and sold for home consumption in England, but not for export, and that, although the flavor, color, consistency, and quality of the English pulp does not measure up to the standard of the pulp in question, the margin of difference lies only in the degree of care, that is, the nonobservance of the selection, preparation, processing, and time of processing requirements in the production of

the pulp in question, both pulps being made from the same materials and produced by the same methods. Counsel cites the case of *United States* v. *Luigi Vitelli Elvea, Inc.*, 11 Cust. Ct. 437, 442, Reap. Dec. 5941, as a case with the "very same fact situation" present. Also cited are the cases of *Scharf Bros. Co. (Inc.)* v. *United States*, 16 Ct. Cust. Appls. 347, T. D. 43089; *United States* v. *Wecker & Co.*, 16 Ct. Cust. Appls. 220, T. D. 42837; and *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T. D. 42714.

Counsel for the Government, on the other hand, contends that the importer has failed to overcome the presumption of correctness attaching to the action of the appraiser; that the facts in the case at bar are closely allied with those in the case of *Luigi Vitelli Elvea, Inc., et al.* v. *United States*, 9 Cust. Ct. 466, Reap. Dec. 5661. (This case was affirmed in Reap. Dec. 5941, *supra*.)

Counsel for the Government further contends that the cost of production in England should be taken as the basis for determining value and not the cost in any other country, and, therefore, Heinz Co. of England should be considered the manufacturer or producer of the merchandise, and the French cost of production statistics offered in evidence are immaterial and have no relevancy to the issues. Counsel also contended that there were various defects in the proof of the costs of production offered by the plaintiff.

Two questions are here presented for consideration; first, is the tomato pulp shipped by the Heinz Co. of England of such similarity to the tomato pulp freely offered for sale in the English market that such English consumption pulp may be used as a measure in determining the value of the Heinz pulp; and, second, is the cost of production of the particular tomato pulp in question in France pertinent to such tomato pulp when exported to the United States from England.

As stated by the Court of Customs Appeals, now the Court of Customs and Patent Appeals, in the case of *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T. D. 42714, if goods are made of approximately the same materials, are commercially interchangeable, are adapted to substantially the same uses, and are so used, ordinarily, they are similar within the meaning of section 402 (b). In *United States* v. *Wecker & Co.*, 16 Ct. Cust. Appls. 220, T. D. 42837, the appellate court interpreted what was meant by "similar" as follows:

* * * The question of similarity is, in each case, to be measured by much the same homely rule that applies to the prospective customer who enters a store seeking some utilitarian article of a certain specified name and style; he finds the article requested is not in stock but that another article, of approximately the same price and which will perform the same functions, is capable of the same use and may be substituted therefor, is available. Such an article is a similar article, notwithstanding the price, the methods of construction, and the component materials may be somewhat different; but, *for all utilitarian purposes, one is a substitute for*

*the other.* It is in this sense, we believe, that the word similar was used in said section 402 (b). [Italics not quoted.]

In *Scharf Bros. Co. (Inc.)* v. *United States,* 16 Ct. Cust. Appls. 347, T. D. 43089, the appellate court stated, respecting similarity, as follows:

\* \* \* The statute contemplates that "similar" merchandise will differ in some respects from the imported article. This court has long recognized the difficulty in making a hard and fast definition for the word "similar" which will always be a safe guide to customs officials in determining value.

In the *Wecker* case, *supra,* the question was whether certain cotton velveteen shipped to the United States from Germany was similar to the cotton velveteen sold for home consumption. The appraiser had found that the velveteens were similar and appraised the merchandise on the basis of foreign value. The importer contended that similar velveteens were not sold in Germany. The Government produced six American importers of velveteens who testified, in substance, that they would accept the imported materials as a good delivery on orders for the German alleged similar qualities, but the importer called three witnesses who testified, in substance, that they would not accept deliveries of such imported goods for the German qualities. The special agent, in his report, stated that "the American qualities are made of cheaper raw material, although they may appear similar to the qualities produced for the home market" and also that "the American qualities are manufactured in a different manner from those produced for the home market. There is a considerable difference between the qualities made for the United States and for Germany." It also appeared that the imported materials were made of cheap and coarse yarns, while the German materials were made of a better quality of yarn. In holding that the velveteens were not similar, the court stated:

Applying the rule laid down in the *Massin* case, *supra,* we must come to the conclusion that there is substantial evidence in the record in support of the judgment of the court below, finding that the imported goods are not similar to the comparable German qualities. There is some substantial evidence that the goods are not made of approximately the same material and that they are not commercially interchangeable.

In the *Scharf Bros.* case, *supra,* the court found that certain rock candy from Holland was similar to the rock candy sold for home consumption. The court noted that the evidence disclosed "that in chemical composition it is similar to the rock candy sold or freely offered for sale for home consumption in Holland, the exported candy and that sold in Holland being made at the same time, in the same vat, and from the same material." The appellate court stated, however, that "If these were the only reasons why the court below determined

that the merchandise sold in Holland for home consumption was similar to the imported merchandise, we would be compelled to disagree with it," but the court came to the conclusion that the rock candy sold in Holland was similar to the rock candy exported for additional reasons, as follows:

* * * that chemically the two products are identical, the difference being in the size of the crystals and in the fact that for the home market the crystals are separated and the strings broken before sale. The crystals of the candy consumed in Holland are very much larger and more regular in form than those in controversy. In each instance both products are sold by the pound. It is agreed that the rock candy imported and the rock candy used in Holland is sold in drug stores and is used for the same and only purpose, to wit, when, in solution with something else, it is taken for colds.

The foregoing *Wecker* case, *supra*, is in some respects analogous to the situation now before the court as to the similarity of the goods sold in the foreign market and sold for export to the United States, but a case which seems to be exactly in point is the *Luigi Vitelli Elvea* case, *supra*, here cited by both the plaintiff and the defendant. The single judge, sitting in reappraisement, Reap. Dec. 5661, recited the facts in some detail. It appears that the merchandise there at issue also involved tomato products, to wit, peeled tomatoes, tomato paste, and tomato sauce. Such products, when packed for the American market, involved only selected tomatoes which were sound and ripe, and such as come within the specifications of the United States Department of Agriculture as to the amount of skin or peel in the tins and the amount of mold or bacteria. When packed for the Italian home market, such products are made from the run of the crop of tomatoes, consisting of sound tomatoes but including also green, light-colored, and sunburned tomatoes, and such as were discarded in packing peeled tomatoes for the United States market. In the paste or sauce, the peelings from the peeled tomatoes were used in the home consumption product, and the mold count and bacteria were much higher than the product destined for the United States, and it also had a different flavor. The court came to the conclusion that while the peeled tomatoes and the tomato paste packed for both markets were derived primarily from the same kinds of tomatoes, such fact did not conclusively show that the products for the two markets were similar. Thereupon, the court found that the weight of evidence supported the claim of the plaintiff that the peeled tomatoes and tomato paste or sauce, as imported in that case, were not sold in Italy in the ordinary course of trade and were not similar to products of the same name freely offered for sale in Italy, and held that there was no foreign value for the merchandise.

On appeal to the appellate division, Reap. Dec. 5941, the single judge sitting in reappraisement was affirmed, the court stating:

It is clear that while the export pack of tomato products in Italy at the time here involved might have been substituted for the home consumption pack, the reverse was not true, because of the fact that the home consumption pack would not meet the American Government restrictions. Under these circumstances, we do not see how the home consumption pack could be considered to be "similar," for value purposes, to the export pack. If the home consumption pack could not be substituted for the export pack, it was, for export purposes, valueless, and could not form a yardstick by which to measure the value of the export goods.

In view of the foregoing decision, it is my opinion that the tomato pulp in question is neither such or similar to the tomato pulp freely offered for sale in the English market.

Concerning the contention of plaintiff that the cost of production in France should be used as a measure of the value of the merchandise in question, it has long been held that the dutiable value of goods imported from countries other than that of their production or manufacture was to be determined by the prices in the principal markets of the country from which they were imported into the United States. See *Stairs* v. *Peasley*, 18 How. 521.

In the case of *Maier, Morton & Browne* v. *United States*, 11 Ct. Cust. Appls. 115, T. D. 38753, certain dry goods were manufactured in Great Britain and shipped to Canada. The Canadian company placed the goods in bond without the payment of Canadian duty. Later, said merchandise was shipped to a purchaser in the United States. The court held that the value in Canada, rather than the value in England, constituted the proper market value of the merchandise. The court stated:

At this point it may be noted that the importers do not claim that these goods were imported into this country from England, nor could such a claim be sustained upon the record. For while it is true that they were manufactured in England, yet they had afterwards become the property of the Canadian company, and had been sold as such to the appellants herein. It must therefore be conceded that they were Canadian as distinguished from English importations when they were entered at the ports of this country.

In *United States* v. *G. W. Sheldon & Co. (Damon Raike & Co.)* 53 Treas. Dec. 34, T. D. 42541, the court stated:

Merchandise imported from one country, being the growth, production, or manufacture of another country, must be appraised at its value in the principal markets of the country from which immediately imported, unless it is shown that it was destined for the United States at the time of original shipment without any contingency of diversion.

In the case of *United States* v. *Canadian National Railways*, 11 Cust. Ct. 365, Reap. Dec. 5901, certain linen tableware had been manufactured in Belfast, Ireland, for a Canadian firm in fulfillment of a contract to supply table linen for the Canadian National Railways. The linens were crested with the maple-leaf design of the ultimate consumer. Upon importation of the linens into the United

States, the appraiser determined that there was no statutory foreign or export value, nor United States value, and that the linens should be appraised upon the basis of the cost of production. The nearest he could estimate such cost of production was the price in Montreal. Therefore, he appraised the merchandise at the invoiced and entered value. The collector appealed for a reappraisement, and the Government attempted to establish a foreign value in Canada, which it failed to do. The court held as to the cost of production that the value adopted by the appraiser, in the absence of any other evidence of value, was presumptively correct.

In *United States* v. *H. S. Dorf & Co., Inc., a/c Joseph H. Meyer Bros.*, 30 Cust. Ct. 664, A. R. D. 28, certain glass rods had been ordered by Joseph H. Meyer from certain French manufacturers to be shipped to Mexico for the purpose of manufacturing into certain beads. The merchandise was forwarded to the United States for transshipment by Meyer Bros. to Mexico. On account of the urgency expressed by the Mexican manufacturer, half of the quantity was shipped by fast freight, and the remainder was forwarded by ship to Vera Cruz. As the manufacturer in Mexico had found the portion received as unsatisfactory, request was made that the remainder not be forwarded. Inasmuch as it was already under way, Meyer Bros. advised its broker in Vera Cruz to return same. Application was made at the Vera Cruz customhouse to return the merchandise upon arrival to the United States for the reason that it was unusable. Such permission was granted. When the shipment was returned to New York, it was entered on a *pro forma* invoice, prepared by the New York broker. The appraiser found the value upon the basis of a Mexican cost of production.

The appellate division found that there was no diversion in transit of the merchandise. At the time the merchandise first left New York destined for Mexico, it was the intention of both the French shipper and the American purchaser that, upon arrival in Mexico, it was to be taken off the ship and delivered to the ultimate consignee. That is to say, at the time of exportation of the merchandise from France, it was not the intention to send the merchandise to the United States, except in transit to Mexico, and it was never exported from France to the United States, when it had first arrived in the United States.

The court also considered whether or not a change of intent upon the part of the American purchaser, not established to have been made known to the proper authorities in Mexico when the merchandise was, in fact, unladen from the vessel at the port of Vera Cruz, may be related back to the French exporter in such a manner as to characterize this transaction as an exportation from France to the United States. The court decided that it did not, citing the case of *United*

*States* v. *American Railway Express Co.*, 11 Ct. Cust. Appls. 505, T. D. 39659. In that case, certain baskets were imported from Japan through the port of San Francisco. They were there sold to a resident of Canada and shipped to Canada. Before arrival of the baskets at their destination, the Canadian purchaser moved to Buffalo, N. Y. Upon arrival of the baskets in Canada, they were held in customs custody for 6 days and then remanifested under customs supervision and shipped to the owner in Buffalo. Upon arrival in the United States, the baskets were again assessed with duty as a reimportation. The court, in sustaining the collector's action, stated:

> In respect to the second claim set out in the protest we may say that the shipment of the merchandise from the United States into Canada with the intention of importing it into that country amounted under the circumstances to an exportation thereof from this country. Accordingly when it was shipped again into the United States there was a reimportation thereof, and duty again accrued.

The court held in the *Dorf* case, *supra*, that Mexico and not France was the country of exportation.

In view of the decisions cited, I am of the opinion that any cost of production of the merchandise used for valuation purposes relates to the cost of production thereof, in the country from whence last exported. Inasmuch as the appraiser testified that he appraised the merchandise upon the basis of cost of production in the English market, and such evidence has not here been controverted, and being further of the opinion that the similarity of the merchandise with the English pack was not established, I hold that the values returned by the appraiser stand as the presumptively correct value of the merchandise for duty purposes.

Judgment will, therefore, be entered in favor of the Government.