(A. R. D. 61)

H. J. HEINZ COMPANY v. UNITED STATES

Entry Nos. 739; 957.

First Division, Appellate Term

(Decided August 19, 1955)

*Jerome G. Clifford* for the appellant.

*Warren E. Burger*, Assistant Attorney General (*Samuel D. Spector*, trial attorney), for the appellee.

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: This is an application for review of the decision and judgment of the trial court, Johnson, J., involving the proper value applicable to certain tomato pulp exported to this country from England. *H. J. Heinz Company* v. *United States*, 32 Cust. Ct. 633, Reap. Dec. 8309.

The merchandise (described as F–1 and F–5, 10- x 5-kilo tins, and as F–2, 6- x 5-kilo tins) was produced in France where it was sold and shipped to H. J. Heinz Company, Ltd., London, England (hereinafter referred to as Heinz of London). Subsequently, the said merchandise was purchased from the London firm by the appellant (hereinafter referred to as Heinz of Pittsburgh).

The tomato pulp covered by reappraisement 210402–A, exported December 7, 1950, was invoiced and entered as follows: Lots F–1 and F–5 at sterling 114–6–3 per 1,000 kilos, net packed, and lot F–2 at sterling 101–17–3 per 1,000 kilos, net packed. The F–1 and F–5 lots in this shipment were appraised at sterling 133–8–10 and lot F–2 at sterling 118–13–0.

As to the merchandise covered by reappraisement 210403–A, exported February 7, 1951, lots F–1 and F–5, 10- x 5-kilo tins, and lot F–2, 6- x 5-kilo tins, were invoiced at sterling 91–0–0 per 1,000 kilos and were entered at sterling 101–0–0 per 1,000 kilos. In this shipment, lots F–1 and F–5 were appraised at sterling 133–8–10 per 1,000 kilos, and lot F–2 was appraised at sterling 118–13–0 per 1,000 kilos, packed.

Appraisement of the merchandise covered in both shipments was based upon cost of production (section 402 (f) of the Tariff Act of 1930). The court below found the values returned by the appraiser to be the presumptively correct values.

Appellant contends here, as it did in the court below, that the correct basis of value is the foreign value of "similar" merchandise (section 402 (c) of the Tariff Act of 1930, as amended), and such value is 88 shillings per 50 kilos in the case of the merchandise covered by reappraisement 210402–A (entry 739) and 84 shillings per 50 kilos with respect to the merchandise involved in reappraisement 210403–A (entry 957). Alternatively, appellant contends that if there be no statutory foreign value for the merchandise, it should be valued on the basis of cost of production in France, the country in which the tomato pulp in question originated, and that such values are sterling 89–0–7 for lot F–2, sterling 96–0–0 for lot F–5, and sterling 92–10–0 for lot F–1, with respect to such items in both of the involved entries.

Appellee, on the other hand, maintains that these shipments are exportations from England and should be valued on the basis of the cost of production in that country.

The record establishes that no such or similar tomato pulp is produced commercially in England, but the requirements therefor are imported from France, Italy, Spain, and Portugal. The pulp imported into England is offered for sale and sold in that country and will hereinafter be referred to as the English home consumption pulp.

Plaintiff's exhibit 1, an affidavit of Alan McWilliam, manager of the crop contracts department of Heinz of London, states that he is personally familiar with the tomato products wherever produced for Heinz of London and Heinz of Pittsburgh and that he was also familiar with tomato pulp and other tomato products offered for sale and sold in the principal trade centers in France, Italy, England, and the United States, and with the quantities in which and the prices at which such products were offered and sold therein, and with the quality and uses of such tomato products.

The affidavit further recites that the said English home consumption pulp is used by other manufacturers of tomato products in England for the same purposes as that of the instant tomato pulp, namely, in the preparation of tomato products and food dishes. It

states, however, that the price of the Heinz tomato pulp is higher by reason of its superior quality, and that, while Heinz tomato pulp such as here imported could be beneficially substituted in the tomato products of other English manufacturers, the English home consumption pulp would not be an acceptable substitute for the Heinz pulp, inasmuch as the latter "was produced in France from carefully selected tomatoes, carefully cleaned, trimmed and washed to reduce mould content and black specks." It also states that the Heinz pulp was manufactured during the height of the season so as to produce a good, red, ripe tomato color pulp of superior grade, whereas the English home consumption pulp was not up to the standard of the Heinz pulp inasmuch as such extra precautions were not employed.

That the English home consumption pulp was not up to the standards of the tomato pulp sold to Heinz of London, but was inferior in quality and grade, was also attested to by the French producers of the involved tomato pulp (paragraph 5, plaintiff's exhibit 3, and paragraph 4, plaintiff's exhibit 4).

The foregoing analysis indicates, in our opinion, that both the French producers and the English purchaser of the involved pulp recognize that there are different commercial qualities of tomato pulp for the English market, and that the Heinz pulp is of a higher quality than the English home consumption pulp, due to differences in flavor, color, consistency, and selection and preparation of the tomatoes used.

In *United States* v. *Luigi Vitelli Elvea, Inc., et al.*, 11 Cust. Ct. 437, Reap. Dec. 5941, the merchandise involved consisted of certain canned peeled tomatoes and canned tomato paste which was appraised on the basis of foreign value (section 402 (c) of the Tariff Act of 1930, prior to the passage of the Customs Administrative Act of 1938). The importer contended therein that the merchandise under consideration was not similar in any material respect to the tomato products packed and sold for home consumption in Italy, thus negating a finding of foreign value. In holding that the imported tomato products were not similar to the tomato products sold for home consumption, the court, page 443, stated as follows:

> It is clear that while the export pack of tomato products in Italy at the time here involved might have been substituted for the home consumption pack, the reverse was not true, because of the fact that the home consumption pack would not meet the American Government restrictions. Under these circumstances, we do not see how the home consumption pack could be considered to be "similar," for value purposes, to the export pack. If the home consumption pack could not be substituted for the export pack, it was, for export purposes, valueless, and could not form a yardstick by which to measure the value of the export goods.

Appellant in its brief herein, asserting that "commercial interchangeability" is not an invariable requisite in the determination of whether

goods sold in the foreign market are similar to those imported, cites as authority for such proposition the case of *United States* v. *Thomas & Co.* (*Dehler-Signoret Corp.*), 21 C. C. P. A. (Customs) 254, T. D. 46788. The situation in that case, however, is unlike that in the case at bar. There, the merchandise consisted of certain paper tubes and bobbins (used to hold yarn during the spinning, twisting, or warping processes in the textile industry), with slightly varying diameters, the tubes all containing corrugated rings but some containing more of such corrugations than others, with some also more tapered than others. Holding in effect that commercial interchangeability was not an indispensable element in the determination of "similarity," our appellate court found the involved merchandise similar to comparable goods in the country of exportation, it appearing (1) that the imported goods were made from the same material, by the same processes, and used for the same purposes, and (2) that they had the same commercial value, were similar in cost of production, and that the value of the comparable goods sold in the country of exportation was a fair and proper value to be taken as the value of the imported goods. These factors, however, are not present in the case at bar, and the *Thomas* case, *supra*, is not controlling in determining whether the imported Heinz pulp is similar to the English home consumption pulp so as to predicate a finding of foreign value for the imported merchandise.

It appears that no hard and fast rule can be laid down to determine what constitutes "similarity" for appraisement purposes. In the present situation, however, there is substantial evidence in the record that there is a considerable difference between the qualities of tomato pulp sold to the exporter herein, of the type shipped to the importer-appellant, and that sold for home consumption in the English market, and that, in the usual course of trade, these qualities are not commercially interchangeable.

It has been conceded that no "such" merchandise is sold or offered for sale in England. Accordingly, to support its primary claim that the merchandise should be valued at the foreign value thereof, the importer has assumed the burden of proving that a foreign value does exist for "similar" merchandise. On the basis of this record, we do not consider that that burden has been met. The plaintiff's evidence is directed toward a showing that the home consumption pulp differs from the Heinz pulp, but the entire record does not establish that the involved merchandise, although not identical, is, nevertheless "similar" for valuation purposes. *United States* v. *Kraft Phenix Cheese Corp. et al.*, 26 C. C. P. A. (Customs) 224, C. A. D. 21.

It has been conceded that, if no foreign value for the imported merchandise applies, the proper basis of valuation is the cost of

production thereof (section 402 (f) of the Tariff Act of 1930). The importer contends, however, that such value should be its cost of production in France, the country of origin, rather than in England, the country of production.

The record shows that the merchandise covered by the first importation was delivered to the importer out of stock of Heinz of London and that the second importation was shipped from France to Heinz of London where it remained in bonded warehouse until transshipped to the United States. In neither instance were the original shipments from France destined for the United States without any contingency of diversion.

In the case of *United States* v. *G. W. Sheldon & Co. (Damon Raike & Co.)*, 53 Treas. Dec. 34, T. D. 42541, page 36, it was held:

Merchandise imported from one country, being the growth, production, or manufacture of another country, must be appraised at its value in the principal markets of the country from which immediately imported, unless it is shown that it was destined for the United States at the time of original shipment without any contingency of diversion. There is nothing in the record to show that all of the merchandise under consideration herein could not have been withdrawn at any time from warehouse for consumption in Canada. There is proof that it was the intention to withdraw all of it for such consumption, and part of each shipment herein was actually so withdrawn. Therefore it is clear that there was a contingency of diversion, covering all the merchandise, for consumption in Canada. (George W. Booth *v.* United States, G. A. 4719, T. D. 22338; Maier, Morton & Browne *v.* United States, 11 Ct. Cust. Appls. 115, T. D. 38753.)

Accordingly, we are in agreement with the conclusion reached by the trial court that the merchandise here in question is properly valued on its cost of production in England, as represented by the appraised values.

On the record herein, we find as facts:

(1) That the merchandise in question consists of tomato pulp produced in France which was sold to H. J. Heinz Company, Ltd., London, England, and subsequently sold and shipped by the latter to the appellant herein, H. J. Heinz Company, Pittsburgh, Pa., U. S. A.

(2) That on or about the dates of exportation of the involved tomato pulp such or similar merchandise was not sold or freely offered for sale for home consumption in the principal markets of England, in the usual wholesale quantities and in the ordinary course of trade.

(3) That on or about the dates of exportation of said tomato pulp such or similar merchandise was not sold or freely offered for sale in the principal markets of England, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States.

(4) That such or similar merchandise was not freely offered for sale for domestic consumption, packed ready for delivery, in the principal markets of the United States to all purchasers, at the time

of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade.

(5) That the cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration, plus the usual general expenses in the case of such or similar merchandise, plus the cost of containers, and plus an addition for profit was the values returned by the appraiser.

We conclude as a matter of law:

(1) That there is no foreign, export, or United States value for the merchandise herein, as those terms are defined in section 402 of the Tariff Act of 1930, as amended.

(2) That cost of production, as that value is defined in section 402 (f), Tariff Act of 1930, is the proper basis for determining the value of the instant merchandise.

(3) That such cost of production was the values returned by the appraiser.

The decision and judgment of the trial court are in all respects affirmed.

Judgment will be entered accordingly.